# EXHIBIT A

ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2005 JUN -6 P 3: 46

U.S. DISTRICT COURT
BRIDGEPORT, CONN

HALOX TECHNOLOGIES, INC.,

    Plaintiff,

V.

DRIPPING WET WATER, INC.,
RICHARD SAMPSON and
ALLISON SAMPSON,

    Defendants and Counterclaim Plaintiffs,

V.

PULSAFEEDER, INC., and
IDEX CORP.,

    Additional Counterclaim Defendants.

No. 3:03cv01008 (SRU)

June 6, 2005

## COUNTERCLAIM

**Parties**

    1.    Counterclaim Plaintiff, Dripping Wet Water, Inc., is a Texas Corporation whose address is 8622 Raintree Woods Drive, Fair Oaks Ranch, Texas 78015.

    2.    Counterclaim Plaintiff, Allison Sampson, is an Individual whose address is 8622 Raintree Woods Drive, Fair Oaks Ranch, Texas 78015.

    3.    Counterclaim Plaintiff, Richard Sampson., is an Individual whose address is 8622 Raintree Woods Drive, Fair Oaks Ranch, Texas 78015.

    4.    Counterclaim Defendant Halox Technologies, Inc., is a Delaware corporation having a principal place of business at 304 Bishop Avenue, Bridgeport, Connecticut 06610.

5.    Counterclaim Defendant Idex Corporation, is a Delaware corporation having a principal place of business at 630 Dundee Road, Northbrook, Illinois 60062.

6.    Counterclaim Defendant Pulsafeeder Inc., is a Delaware corporation having a principal place of business at 630 Dundee Road, Northbrook, Illinois 60062.

**Jurisdiction and Venue**

7.    Jurisdiction of this Court is based on 28 U.S.C. §1331 and 15 U.S.C. §1121, in that there is a federal question arising under the laws of the United States.  Jurisdiction over the state law claims is conferred by the Court's supplementary jurisdiction, 28 U.S.C. §1367.  There is also an independent basis for jurisdiction over those claims because the parties are of diverse citizenship under 28 U.S.C. §1332 and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.    Venue in Connecticut is proper in this case under 28 U.S.C. § 1391.

**Background**

9.    Counterclaim Plaintiffs Richard Sampson and Allison Sampson are Chemical Engineers.

10.    In 1994, the Sampsons founded a company known as Halox Technologies Corporation ("HTC").

11.    The business of HTC was to manufacture and sell water disinfection equipment.

12.    The principal intellectual property asset of HTC was a patent obtained by Richard

2

Sampson and Allison Sampson, which was issued in May 1995.

13.    Since the Sampsons lacked the capital to fund their business by themselves, they obtained investment from venture capitalists, who, along with the Sampsons, owned the company.

14.    In or about August, 2000, the venture capitalists terminated the Sampsons' employment with HTC.

15.    In or about March, 2002, assets of HTC were acquired by Counterclaim Defendant Idex Corporation, but the Corporation and business of HTC remained.

16.    Idex, as part of its due diligence in connection with the acquisition, did not meet with the Sampsons.

17.    On or about September 11, 2001, the Sampsons incorporated a new business, Dripping Wet Water, Inc. ("DWW").

18.    The business of DWW would be to manufacture and sell the Sampsons' new invention, which was the subject of a patent application filed in August, 2001.  This invention represented an innovate approach to chlorine dioxide generation for water disinfection.

19.    DWW did not begin any sales or marketing activity until, at the earliest, October, 2001.

20.    On or about October 9-13, 2001, the Sampsons and DWW attended the Association of Water Technologies ("AWT") Tradeshow in Dallas, TX.  This event was

3

essentially the public launch of the Sampsons' new business, DWW.

21.     At the AWT show, DWW had a display booth.  Separately, representatives of both HTC and Idex/Pulsafeeder visited their booth and collected the literature, which clearly explained the technology.

22.     Between October, 2001, and the next AWT show in September, 2002, DWW began to sell products.  Its first commercial sale was achieved on January 16, 2002.

23.     On or about September 18-21, 2002, at the AWT show in Orlando, Florida, DWW once again had a display booth.

24.     Paul Beldham and Steve Ebersohl, who were employed by, and were acting on behalf of, Pulsafeeder and/or Idex, visited the DWW booth.

25.     During their visit to the booth, Beldham approached Richard Sampson and inquired whether DWW would consider exploring a business arrangement with Idex and/or Pulsafeeder, in the form of a joint venture or licensing agreement.  He asked the Sampsons to explain the product more fully to them and to Marta Broge, an Idex employee who had been responsible for the acquisition, by Idex, of Halox.  The Sampsons agreed and made a presentation.

26.     After the AWT show, Beldham followed up with Richard Sampson. Beldham reiterated the Idex group's interest in doing business, whether in the form of a licensing agreement, a joint venture, or an outright acquisition.  Beldham arranged for Felix DiMascio, a Halox employee, to visit the Sampsons and DWW.

4

27.    Beldham represented that the purpose of DiMascio's visit was to perform due diligence as a prelude to a possible business arrangement.

28.    As such, DiMascio, and Halox, were to act, and did act, as agents of Idex and Pulsafeeder.

29.    DiMascio had worked for Allison Sampson in the R & D Department during the period when the Sampsons were at Halox.

30.    DiMascio did in fact visit the Sampsons in Texas for two days in December, 2002.

31.    During his visit, DiMascio had numerous discussions with both Richard and Allison Sampson.

32.    The Sampsons and DWW gave DiMascio their full cooperation, based on Beldham's representations to them that the purpose of the visit was to perform due diligence on the DWW technology to enable Idex to evaluate the prospect of doing business with the Sampsons and DWW.

33.    The Sampsons and DWW allowed DiMascio unfettered access to their manufacturing facility, demonstrated the operation of a unit, and answered his questions about the technology in detail.  DiMascio represented that he was impressed with the product and that he intended to recommend that the two companies do business together.

34.    In January, 2003, Beldham, in a phone conversation with Richard Sampson, represented that from Idex's perspective, DiMascio's visit with the Sampsons had been a success.  He stated that DiMascio gave the DWW product and technology a "glowing report."

35.    During that conversation, Beldham stated that Idex was "still interested" in pursuing a joint venture or license arrangement with the Sampsons and DWW, but for business reasons any transaction would have to be delayed until the third quarter of 2003.

36.    In subsequent conversations during 2003, up to and including approximately June 1, 2003, Beldham continued to assure Richard Sampson that the Idex group was still actively considering doing business with the Sampsons and DWW.

37.    Counterclaim Plaintiffs DWW and the Sampsons have invested substantial time, effort, and sums of money on research, development, trademarks, patents, manufacturing, advertising, promotion, and marketing for the Product, and in the development of public acceptance and goodwill associated with the Product.

38.    After its launch, the Product proved to be a commercial success.  Sales of the domestic Product increased between January 2002 and August 2003.

39.    DWW's entire business was focused on the manufacture and sale of the Product.  In advertising and promotion, DWW and its dealers consistently emphasized the innovative nature of the Product, and in particular the Product's innovation and quality, as well as its cost-saving and safety features.

**The Idex Group Disparages the DWW Product**

40.    DiMascio, upon his return from visiting the Sampsons and DWW in Texas, created a "report" of his visit.

41.    Also in 2003, Halox created a "Powerpoint" presentation, based, in whole or in part, on DiMascio's report, which purported to compare the DWW product and technology to the Halox product and technology.

42.    Beginning in approximately April, 2003, and continuing through at least August, 2003, Halox began distributing and disseminating both the DiMascio report and the Powerpoint presentation (together, the "Marketing Materials") to sales representatives and, either directly or indirectly, to prospective and actual customers.

43.    These prospective actual customers were prospective purchasers not only of the Halox product but also the competitive DWW product.

44.    The Marketing Materials contain false, inaccurate and misleading data and information.

45.    The Marketing Materials give the appearance that the Product was not effective, when in fact the Product was and is effective. Moreover, the Report impugns the legitimacy of DWW's own claims about the performance of its Product.

46.    DiMascio, who had worked under Allison Sampson in the HTC lab, harbored a belief—unbeknownst to Counterclaim Plaintiffs—that the Sampsons' new invention somehow relied on his own work. Indeed, in September 2002, after the AWT Show, DiMascio, with the consent and approval of Halox, filed a patent application by which he claimed the Sampsons' invention as his own. Accordingly, DiMascio, who made this view known to Halox, Pulsafeeder, and Idex, was biased against the Sampsons. Therefore, his investigation was ill-suited to provide a reasonable and objective basis for an evaluation of the DWW Product's performance.

47.    Among the false statements were the following:

a.    That Counterclaim Plaintiff's published chemical equation is incorrect and is actually a

completely different equation.

b.    That Counterclaim Plaintiff's product creates a potential safety hazard.

c.    That as a result of the different equation the cost of operation of the Counterclaim Plaintiff's product is much higher than it actually is.

d.    That Counterclaim Plaintiff's product causes EPA chlorite violations.

e.    That Counterclaim Plaintiff's product lacks safety features.

f.    That Counterclaim Plaintiff's hire laborers by the hour at nights with no benefits to create their product.


48.    By the above listed statements in paragraph 47, Counterclaim Defendants meant, and were understood by all persons reading or hearing these words to mean, that the Counterclaim Plaintiff's business uses the wrong formula to create its product and as such, manufactures a costly and unsafe product and that the quality of the product is poor, and further, the means by which the product is created is in violation of the laws of the United States and of the State of Texas.


49.    The above specified words were read by Jim Lukanich at ChemCal, and by diverse persons.


50.    Furthermore, during this time, Counterclaim Defendants did publish orally, among other false statements, the following false statements regarding the Counterclaim Plaintiffs:

a.    That Dripping Wet Water, Inc., Allison Sampson and Richard Sampson stole the technology they are using from Halox; and

b.      That Dripping Wet Water, Inc., Allison Sampson and Richard Sampson are going to lose their patent on their technology.

51.      By the words listed above in paragraph 50, Counterclaim Defendants meant, and were understood by all persons hearing these words to mean that the Counterclaim Plaintiffs are thieves, and liars, and do not own the rights to their product legally, but, rather, had stolen Halox's property.

51.      The above specified words were heard by Keith Kennedy and Carl Groenewegen at JohnsonDiversey, and by diverse persons.

52.      Counterclaim Plaintiffs further allege that the Counterclaim Defendants Pulsafeeder, Inc. and Idex Corporation, in addition to their conduct in arranging, under false pretenses, for DiMascio to visit the Sampsons and DWW, as their agent, have also ratified, approved and condoned the acts of Halox both expressly and impliedly.

### FIRST COUNT  (Product Disparagement under the Lanham Act) (against all Counterclaim Defendants)

1-52.  Paragraphs 1-52 of the Complaint are hereby repeated and realleged as if fully set forth herein.

53.      The Marketing Materials' claimed description of the properties of the DWW product shows characteristics far inferior to that of the actual properties and performance of the Product.

54.      The efficiency and safety properties of the Product are perceived by consumers of these products to be a very important factor in the buying decision.

9

55.    Counterclaim Defendants' representations concerning the quality and inherent characteristics of Counterclaim Plaintiffs' Product are false and misleading.

56.    Counterclaim Defendants' representations concerning Counterclaim Plaintiffs' Product are false or misleading descriptions or representations in connection with goods in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

57.    In commercial advertising or promotion, Counterclaim Defendants' representations concerning Counterclaim Plaintiffs' Product misrepresent the nature, characteristics and qualities of Counterclaim Plaintiffs' goods, in violation of 15 U.S.C. §1125(a)(2).

58.    Counterclaim Defendants' representations concerning its own products, are false or misleading descriptions or representations in connection with goods or services in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

59.    Counterclaim Defendants' statements actually deceived or have the tendency to deceive a substantial segment of their audience.

60.    Such deception is material, in that statements and misrepresentations of and concerning the Counterclaim Plaintiffs' Product are likely to influence purchasing decisions because purchasers of these products are principally concerned with efficacy, quality, cost, and safety considerations, and because purchasers are likely to be influenced by misrepresentations on these subjects.

61.    Counterclaim Defendants' misrepresentations were used in connection with goods in commerce.

62.    Counterclaim Defendants' misrepresentations have tended to have a substantial effect on DWW's interstate business.

63.    DWW has been, or is likely to be, damaged by the use of Counterclaim Defendants' false descriptions and representations, both by the loss of sales of the product to present and potential customers, and by the loss of goodwill among customers.

**SECOND COUNT    (Product Disparagement/Trade Libel)**
**(by DWW, against all Counterclaim Defendants)**

1-63.    Paragraphs 1-63 of the Complaint are hereby repeated and realleged as if fully set forth herein.

64.    The publication of the Marketing Materials disparaged the quality of the DWW Product.

65.    Counterclaim Defendants intended for publication of the statements to result in harm to DWW's interests, or either recognized or should have recognized that it was likely to do so.

66.    Counterclaim Defendants knew that the statements were false or acted in reckless disregard of their truth or falsity.

67.    The circumstances under which the publication was made were such as to make reliance upon it by third persons, i.e., DWW's actual and potential customers, reasonably

11

foreseeable because of the claimed scientific investigation of the DWW product made by DiMascio.

68.    The recipients of the publication understood the injurious character of the false statements, in that they viewed the statements of Counterclaim Defendants as directly contradicting DWW's own claims with respect to the advantageous properties of the Product.

69.    The Counterclaim Defendants published disparaging words regarding the character, quality, and ownership of Counterclaim Plaintiff's chattels and/or intangible things, with the knowledge that the publication was false, or with an entire want of care and conscious indifference to the rights of Counterclaim Plaintiff in that the information complained of was published with reckless and heedless disregard for the truth or falsity of the publication and had no factual basis. Counterclaim Defendant intentionally and/or recklessly published these words to cast doubt on and/or a third party reasonably understood these words to cast doubt on Counterclaim Plaintiff's chattels and/or intangible things. Publication of words in such a manner constitutes malice on the part of the Counterclaim Defendants. At no point did the Counterclaim Defendants have any privilege in their publication.

70.    As a direct and proximate result of the foregoing conduct, the Counterclaim Plaintiff DWW was severely injured and suffered pecuniary loss from the publication in the following ways:

    a)    Gross domestic sales dropped off from approximately $17,000 per month for February 2003 – August 2003, on average, to $9,000 per month for September 2003 – April 2005;

    b)    The Counterclaim Plaintiff's reputation in the industry has been impugned and maligned and its goodwill irretrievably damaged;

12

c)    Commercial purchasers of the Product continue to reject sales overtures, having been influenced to do so by the Marketing Materials;

d)    The Counterclaim Plaintiff lost orders that it reasonably expected to receive, based on its past business with the contracting parties, or based on discussions that had progressed toward a sale;

e)    It lost commitments for increased orders of the Product, which orders would have increased domestic sales substantially; indeed, DWW was poised for expansive growth in 2003;

f)    The value and vendibility of the DWW Product has been drastically and irretrievably impaired;

g)    DWW has incurred expenses in attempting to counteract the publication, including this litigation;

j)    DWW dealers abandoned the Product, and DWW was unable to replace them because of the impact of the Marketing Materials; and

k)    DWW's contract negotiations with a prospective joint venture partner were delayed, and the terms of the agreement under negotiation were rendered less favorable to DWW.

71.    As a direct and proximate result of the Counterclaim Defendants' conduct, the Counterclaim Plaintiff has been injured and has suffered money damages.

**THIRD COUNT** (Tortious Interference with Contractual Relations)
(by DWW, against all Counterclaim Defendants)

13

1-71.   Paragraphs 1 through 71 of the Complaint are hereby repeated and realleged as if fully set forth herein.

72.     Counterclaim Plaintiff DWW enjoyed contractual relationships with a number of customers who had already purchased or had contracted to purchase the product as of the time of the publication of the Marketing Materials.  In addition, DWW enjoyed contractual relations with its independent dealers, water treatment companies.

73.     Counterclaim Defendants had knowledge of these relationships.

74.     By publishing the Marketing Materials, Counterclaim Defendants intended to interfere with those contractual relationships by deterring existing customers from purchasing additional DWW Products.

75.     Counterclaim Defendants' interference was accomplished by improper means, namely, by publishing the Marketing Materials, which constituted an injurious falsehood.

76.     As a consequence of Counterclaim Defendants' conduct, DWW suffered actual loss, including but not limited to:

a)      Gross sales dropped off from approximately $17,000 per month to approximately $9,000 per month.

b)      Regular customers cut back on their business with the Counterclaim Plaintiff, in some instances citing the Marketing Materials and/or the information contained therein as the reason for doing so; and

c)      Dealers and their sales people abandoned the Product, and DWW was unable to replace them because of the impact of the marketing materials.

14

77.    As a direct and proximate result of the Counterclaim Defendant's conduct, the Counterclaim Plaintiff has been injured and has suffered money damages.

**FOURTH COUNT (Tortious Interference with Prospective Advantage)**
**(by DWW, against all Counterclaim Defendants)**

1-77.    Paragraphs 1-77 of the Complaint are hereby repeated and realleged as if fully set forth herein.

78.    Counterclaim Plaintiff DWW, at or about the time of the publication of the Marketing Materials, was poised for rapid growth.  Its expanded network of dealers had many prospective customers at various stages of pre-contract negotiations.

79.  After publication of the Marketing Materials, it became difficult for Counterclaim Plaintiff DWW to market the DWW product.  Prospective customers canceled meetings.   Other prospects refused to meet with DWW.  Still others broke off discussions.  When they gave a reason, prospective customers specifically cited the Marketing Materials.

80.    By publishing the Marketing Materials, Counterclaim Defendants intended to interfere with DWW's business expectancies and prospective advantage by deterring potential customers from purchasing DWW Products.

81.    Counterclaim Defendants' interference was accomplished by an improper means, namely, by publishing the Marketing Materials, which constituted an injurious falsehood.

82.     As a consequence of Counterclaim Defendants' conduct, DWW suffered actual loss, including but not limited to:

a)      DWW lost contracts that it reasonably expected to enter into, based on its past business with the contracting parties;

b)      DWW lost commitments for new or increased orders of the Product, which orders would have increased domestic sales substantially;

c)      DWW lost opportunities to sell the Product to other potential customers, who had previously formed a ready market for Counterclaim Plaintiff's unique product, because the marketplace had been poisoned by the Counterclaim Defendants' injurious falsehood;

d)      DWW's gross sales, which were increasing on a consistent basis at the time the Marketing Materials began to circulate, precipitously declined; and

f)      DWW was unable to attract new dealers for the Product.

83.     As a direct and proximate result of Counterclaim Defendant's conduct, Counterclaim Plaintiff has suffered money damages.

**FIFTH COUNT**  (Unfair Competition)
**(By DWW against all Counterclaim Defendants)**

1-83.   Paragraphs 1-83 of the Fourth Count are hereby repeated and realleged as if fully set forth herein.

84.     The conduct of Counterclaim Defendants constitutes unfair competition.

85.     Counterclaim Plaintiff DWW has suffered damages.

**SIXTH COUNT**  (Unfair Trade Practices)
**(by DWW against Halox)**

16

1-85.    Paragraphs 1-85 of the Fifth Count, are hereby repeated and realleged as if fully set forth herein.

86.    Counterclaim Plaintiff DWW and Counterclaim Defendants are engaged in trade or commerce within the meaning of Conn. Gen. Stat. §42-110b(a).

87.    Counterclaim Defendants' actions constitute unfair or deceptive acts or practices within the meaning of Conn. Gen. Stat. §42-110b(a).

88.    As a result of Counterclaim Defendant's actions, Counterclaim Plaintiff DWW has suffered ascertainable losses of money or property.

89.    The Counterclaim Defendants' conduct was immoral, unethical, unscrupulous, oppressive, all in violation of Connecticut General Statute Sec. 42-110a et seq., the Connecticut Unfair Trade Practices Act ("CUTPA").

90.    Counterclaim Defendants' conduct was willful and/or reckless.

**SEVENTH COUNT (Defamation)(by Allison Sampson, against all Counterclaim Defendants)**

1-90.    Paragraphs 1-90 of the Sixth Count, are hereby repeated and realleged as if fully set forth herein.

91.    The defamatory action complained of in this petition is libelous and/or slanderous within the meaning of Section 73.001 of the Civil Practice and Remedies Code in that it

17

impeaches Counterclaim Plaintiff's honesty, integrity, virtue and reputation. Moreover, since Counterclaim Defendants charge that the Counterclaim Plaintiff is dishonest and assert that she is a thief and liar, this action is libelous or slanderous per se. These false allegations were made negligently and/or intentionally.

92.    As a direct and proximate result of the occurrence made the basis of this lawsuit, Counterclaim Plaintiff, Allison Sampson, was caused to suffer shame, embarrassment, humiliation and mental pain and anguish and has thereby been caused to suffer bodily injury. Additionally, Counterclaim Plaintiff is, and will in the future be seriously injured in her good name and reputation in the community and exposed to the contempt and ridicule of the general public. Counterclaim Plaintiff further alleges a loss of earnings and an impaired earning capacity.

**EIGHTH COUNT (Defamation)(By Richard Sampson, against all Counterclaim Defendants)**

93.    Paragraphs 1-92 of the Sixth Count, are hereby repeated and realleged as if fully set forth herein.

94.    The defamatory action complained of in this petition is libelous and/or slanderous within the meaning of Section 73.001 of the Texas Civil Practice and Remedies Code in that it impeaches Counterclaim Plaintiff's honesty, integrity, virtue and reputation. Moreover, since Counterclaim Defendants charge that the Counterclaim Plaintiff is dishonest and assert that he is a thief and liar, this action is libelous or slanderous per se. These false allegations were made negligently and/or intentionally.

95.    As a direct and proximate result of the occurrence made the basis of this lawsuit, Counterclaim Plaintiff, Richard Sampson, was caused to suffer shame, embarrassment,

18

humiliation and mental pain and anguish and has thereby been caused to suffer bodily injury. Additionally, Counterclaim Plaintiff is, and will in the future be seriously injured, in his good name and reputation in the community and exposed to the contempt and ridicule of the general public. Counterclaim Plaintiff further alleges a loss of earnings and an impaired earning capacity.

WHEREFORE, Counterclaim Plaintiff DWW claims:

1.    A permanent injunction ordering Counterclaim Defendants to:

(a) cease and desist from distributing, disseminating, or otherwise publishing the unlawfully disparaging statements in the Marketing Materials; and

(b) issue corrective advertising, in the form of a letter on company letterhead and endorsed by representatives of each Counterclaim Defendant, (1) acknowledging the falsity of the statements made in the marketing materials, and (2) and renouncing, revoking, and withdrawing those materials.

2.    Compensatory Damages.

3.    Treble damages, under 15 U.S.C. §1117.

4.    Punitive damages, under Conn. Gen. Stat. §42-110g(a), against Counterclaim Defendant Halox.

5.    Attorneys' fees, under Conn. Gen. Stat. §42-110g(d) (against Counterclaim Defendant Halox) and/or 15 U.S.C. §1117 (against all Counterclaim Defendants).

6.    Interest.

7.    Costs of the action.

And Counterclaim Plaintiffs Richard Sampson and Allison Sampson demand:

1.    Compensatory damages.

2.    Interest.

3.    Costs of the action.

**JURY TRIAL DEMANDED**

Edward R. Scofield (ct00455)

Zeldes, Needle & Cooper, P.C.
1000 Lafayette Blvd., Suite 500
Bridgeport, CT 06604
Tel: (203) 333-9441
Fax: (203) 333-1489
e-mail: escofield@znclaw.com

Attorney for Defendants/Counterclaim Plaintiffs

20

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent via U.S. First Class Mail, postage prepaid, on this date, to:

>       Michael J. Rye, Esq.
>       Charles F. O'Brien, Esq.
>       Cantor & Colburn LLP
>       55 Griffin Road South
>       Bloomfield, CT 06002

Dated at Bridgeport, Connecticut on this _6_ day of June, 2005.

Edward R. Scofield