# EXHIBIT C

FILED

2007 JUN 22  PH 2: 58

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **Dripping Wet Water, Inc., Allison H. Sampson, and Richard L. Sampson,** §<br><br>*Plaintiffs,* §<br>vs. §<br><br>**Idex Corporation, Halox Technologies., Inc., Pulsafeeder, Inc., and Felice DiMascio,** §<br><br>*Defendants.* § | Case No.: SA -07-CA-____<br><br>(Jury Trial Demanded) |

**SA07CA0531 XR**

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiffs, Dripping Wet Water, Inc., Richard L. Sampson and Allison H. Sampson

(hereinafter "Plaintiffs' or "the DWW Parties") complain of Defendants Idex Corporation, Halox

Technologies, Inc., Pulsafeeder, Inc., and Felice DiMascio ( "Defendants") and allege as follows:

## I.
## PARTIES

1. Plaintiff, Dripping Wet Water Corporation ("DWW") is a Texas corporation, with its

principal place of business at 141 Industrial #300, Boerne, Texas 78006.

2. Plaintiff, Allison H. Sampson, is an individual residing at 29520 Red Bud Hill, Fair

Oaks Ranch, Texas 78015.

3. Plaintiff, Richard L. Sampson, is an individual residing at 29520 Red Bud Hill, Fair

Oaks Ranch, Texas 78015.

4. On information and belief, Defendant Idex Corporation ("Idex") is a Delaware

corporation with its principal place of business in Northbrook, Illinois. Idex is a holding

company that owns numerous separately incorporated businesses, including Defendant Halox,

Technologies, Inc. that manufacture and sell chlorine dioxide generators, pump products, dispensing equipment, and other industrial products.

5.  Upon information and belief, Defendant Halox Technologies, Inc. ("Halox") is a Delaware corporation, with its principal place of business in Bridgeport, Connecticut.

6.  Upon information and belief, Defendant Pulsafeeder Inc. ("Pulsafeeder") is a Delaware corporation, with its principal place of business in Northbrook, Illinois.

7.  Upon information and belief, Defendant Felice DiMascio ("DiMascio") is an individual residing at 1 Webster Lane, Rocky Hill, Connecticut  06067-2067.  DiMascio is, and at all relevant times was, employed by Defendant Halox.

## II.
## NATURE OF THE SUIT
## JURISDICTION AND VENUE

8.  This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 28 U.S.C. § 1338, 28 U.S.C. § 2201, and 35 U.S.C. § 256.

9.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), (c) and (d).

10.  Defendants are subject to the personal jurisdiction of this Court because this action is based upon Defendants' tortious acts partially performed in and directed at residents of the State of Texas and Defendants have transacted, and are planning to transact business in the State of Texas.  Tex. Civ. Prac. & Rem. Code § 17.042.

11.  The court also has supplemental jurisdiction over the state law claims for fraud and intentional concealment, unjust enrichment,  and unfair competition under the principles of pendent jurisdiction.

### III.
### INTERSTATE COMMERCE

12. Defendants' activities, including activities related to its illegal activities, are in the flow of and substantially affect interstate commerce.

13. Defendants manufacture, ship, and sell chlorine dioxide generators and related products, which are at issue in this Complaint, across state lines. Defendants reap substantial revenues from sales of such products, which are at issue in this Complaint, projected to be over one hundred million dollars, throughout the United States.

14. Defendants' purported exclusive ownership of certain US patent rights relating to chlorine dioxide technology, as set forth herein, is a sham. Defendants have knowledge that their asserted claims of exclusivity are baseless. Defendants' assertion of such exclusive patent rights is, and was intended, by Defendants to harm the consuming public and to hinder competitors, including Plaintiff DWW, in the relevant markets. In truth, the Sampson Plaintiffs are the inventors of the unique chlorine dioxide generator technology, copied by DiMascio, after studying Plaintiffs' technology and visiting Plaintiffs' facility in San Antonio, Texas..

### IV.
### FACTS
### OVERVIEW

15. Chlorine dioxide ($ClO_2$) is a highly effective, environmentally friendly biocide used in a variety of disinfection applications. Because of transportation restrictions (US Federal law prohibits the transportation of liquid $ClO_2$), chlorine dioxide is always generated on-site at the point-of-use.

16. This chlorine dioxide in-situ technology has become a significant factor in the water treatment marketplace. Chlorine dioxide kills organisms in water, and then breaks them down

Plaintiffs' Original Complaint                                                                 Page 3

into harmless by-products that are environmentally safe. For this reason, the technology is of interest to the respective parties and to the consuming public. Plaintiff DWW is a direct competitor of Defendants Halox, Idex and Pulsafeeder in the market for manufacture, distribution and sale of such chlorine dioxide generators and related products.

17. Plaintiffs bring this action, in part, under United States patent laws against Defendants for illegal conduct, specifically targeting Plaintiffs, and adversely affecting the markets for chlorine dioxide generators and related products. As a result of Defendants' conduct, Plaintiffs have sustained injury for which Plaintiffs seeks money damages and other appropriate relief to compensate Plaintiffs for the harm Plaintiffs suffered and injunctive relief to end Defendants' illegal conduct.

18. This action also seeks, in part, to correct the inventorship of certain U.S. patents and applications ("the DiMascio Patents") identified in Exhibit "1" hereto.

19. The DiMascio Patents erroneously name Defendant DiMascio as the only inventor when, in fact, each Plaintiff Allison H. Sampson and Richard L. Sampson (" the Sampson Plaintiffs" ) also made substantial contributions to the claimed inventions. Pursuant to 35 U.S.C. Sect. 116, the Sampson Plaintiffs are each entitled to recognition as co-inventors of the subject matter claimed in the DiMascio Patents. Plaintiffs further seek a declaratory judgment under the United States patent laws that Plaintiffs have an ownership interest in the DiMascio Patents.

20. Plaintiffs also bring this action under 28 U.S.C. § 1332, to recover damages, costs of suit, and reasonable attorneys' fees, against Defendants for injuries sustained by Plaintiffs as a result of Defendants' fraud and intentional concealment, unjust enrichment and unfair competition , as alleged herein.

21. The exclusive patent rights asserted by Defendants are not just. Defendants' patent

Plaintiffs' Original Complaint                                                    Page 4

rights , if any,  were copied from Plaintiffs' technology .  Moreover, Defendants have admitted

that Plaintiffs are the true owners of  the unique technology set forth in Plaintiffs' patent

application  for the inventions entitled Methods for Making Chlorous Acid and Chlorine

Dioxide, US Serial No. 09/919, 918,  ("the '918 application") filed August 2, 2001.  (Exhibit

"2")

22.  Defendants have falsely represented to the consuming public, in published media and

elsewhere, that Defendants have exclusive rights to the subject matter claimed in the Dimascio

patents and/or that Defendant DiMascio is the sole inventor of the subject matter claimed in the

DiMascio patents.  Defendants have accordingly misled the consuming public as to the true

inventorship,  and asserted exclusivity in such subject matter.  Defendants' statements are

unfounded, deceptive and not true.

23. At all times set forth herein Plaintiff DWW had   valuable expectations of actual and

prospective business relationships, both from existing and new customers.  Defendants were

aware of the existence of those actual and prospective relationships.  As a result of Defendants'

illegal conduct, Plaintiffs have sustained injury for which Plaintiffs seek money damages,

injunctive relief, and other appropriate relief to compensate Plaintiffs for the harm Plaintiffs have

suffered.

24.  Various persons, partnerships, sole proprietors, firms, corporations and individuals

not named as Defendants in this lawsuit, and individuals, the identities of which are presently

unknown, may have participated as co-conspirators with Defendants in the tortious conduct

alleged in this complaint, and have performed acts and made statements in furtherance of the

alleged conspiracy to harm Plaintiffs.

25.  Plaintiffs are informed and believe, and thereon allege, that at all times mentioned

herein, Defendants and each of them, were the agents and/or employees of each other, and in

doing the things hereinafter alleged, were acting within the course and scope of such agency

and/or employment; and, further that each of the acts alleged herein was done with the full

knowledge, consent, advice and permission of each of the other Defendants.

26.  Plaintiffs are informed and believe and thereon allege that, as set forth above and

without limitation to other said further proof at the time of trial, Defendants and each of them,

knowingly and willfully conspired and agreed among themselves to damage Plaintiffs by, among

other things and without limitation to proof, knowingly and willfully engaging in the tortious

activities set forth herein expressly aimed at, and causing harm to, Plaintiff, and members of the

consuming public in this Judicial District.

27.  Plaintiffs are informed and believe and thereon allege pursuant to such conspiracy, in

furtherance thereof and without limitation to other and further proof, said Defendants committed

the acts stated herein.

28.  Plaintiffs are informed and believe and based thereon allege that these acts were

participated in, and performed by, one or more of said Defendants as act in furtherance of such

conspiracy, and for the unlawful and improper purposes stated herein.

29.  Plaintiffs are informed and believe and based thereon allege, that in doing the tortious

acts alleged herein, said Defendants and each of them acted in a malicious and oppressive

manner, with a conscious disregard for the rights of Plaintiffs, and that such conduct warrants an

award of punitive damages against said Defendants in an amount to be determined at the time of

Trial.

///

///

## PARTICULAR ALLEGATIONS

30. $ClO_2$ is a dissolved gas that is a strong biocide at concentrations as low as 0.1 ppm.
$ClO_2$ can greatly reduce and eliminate biofilm populations and discourages bacterial re-growth.
$ClO_2$ is a neutral species; it does not form weak acids as chlorine and bromine do and, therefore,
is effective over a wide pH range. $ClO_2$ is more efficacious than other oxidizing biocides and is
compatible with most water treatment chemistry.

31. $ClO_2$ has consistently been shown to be the best molecule for controlling the
causation organism of Legionnaires' disease. In the UK, the Building Services Research and
Information Association (BSRIA) has recommended $ClO_2$ as the best available technology of
control of Legionella in hot and cold water systems and the technology is taking hold in the
United States.

32. $ClO_2$ is more eficacious than other biocidal technologies. It attacks pathogens on
initial application and then leaves a residual of $ClO_2$ to discourage re-infection.

a) <u>Potable Water</u>: $ClO_2$ is EPA-approved for both pretreatment and final disinfection of
drinking water. In pre-treatment, it effectively removes iron and manganese and promotes
flocculation. It also removes noxious taste and odors as well as disinfectant byproduct precursors
that can form trihalomethanes (THM's) and haloacetic acids (HAA's). In post-treatment, it
provides a lasting residual throughout the distribution system. $ClO_2$ is ideal for hospital water
systems, small water supplies, cisterns, and water purification membrane systems.

b) <u>Cooling Towers</u>: $ClO_2$ controls algae, planktonic bacteria, and biofilm promoting
maximum efficiency for heat exchangers and ancillary equipment. It provides lasting residual
throughout the distribution system. $ClO_2$ is more efficacious than other oxidizing biocides and
compatible with most water treatment chemistry.

c) <u>Water Treatment and Odor Control</u>: $ClO_2$ safely oxidizes phenols, cyanides,
aldehydes, and mercaptans, reduced sulfur compounds and some pesticides. It is useful in waste
treatment and scrubber systems.

33. Plaintiffs are the owners of a unique technology for generating Chlorine Dioxide
through Ion Exchange in contrast to conventional Electro-Chemical Technology. As set forth in
disclosure of Plaintiffs' '918 application , in contrast to conventional electro-chemical methods,

Plaintiffs' unique technology provides chlorous acid generated from a chlorite salt precursor. Ion exchange material facilitates the generation of chlorous acid by simultaneously removing unwanted cations from the solution and substituting hydrogen ion into the solution. Chlorine dioxide is generated in a controlled manner from chlorous acid by catalysis. Chlorine dioxide can be generated either subsequent to the generation of chlorous acid or simultaneously with the generation of chlorous acid.

34. In commercial use, Plaintiffs' CLO II Generator products, embodying this technology, take the hassle out of conventional electro-chemical chlorine dioxide generators.. Plaintiffs' CLO II Generators use no chemical mixing chemistries and no electrochemical cassettes in their design. The CLO II Generators can dose directly into pressurized lines, and operators don't have to worry about storage of high concentration solutions or chlorinated byproducts. Plaintiffs' unique technology is particularly well suited for cooling tower applications.

35. On October 9 though 13, 2001 Plaintiffs first publicly exhibited their generator products at a trade show in Dallas, Texas sponsored by the Association of Water Technologies (AWT) . To help explain this unique technology to the consuming public, Plaintiffs distributed marketing literature to the attendees describing the advantages of Plaintiffs' ion exchange technology in contrast to conventional electrochemical generation used by competitors.

36. On information and belief, Defendants attended the 2001 AWT Expo and received Plaintiffs' literature which disclosed Plaintiffs' unique technology.

37. On March 22, 2002, Defendant Idex entered into an Asset Purchase Agreement with third party sellers ("the third party Sellers") to acquire certain assets utilizing conventional electro-chemical chlorine dioxide technology.

38. For this transaction, Defendant Idex formed HT Acquisition Corporation, a wholly-owned subsidiary, to acquire the certain business assets (Halox Electro-Chemical Technology) under the Asset Purchase Agreement. After the transaction, HT Acquisition Corporation changed its name to Halox Technologies, Inc., ( Defendant named herein)  In connection with its purchase of the Halox assets Defendant Idex prepared a comparison chart contrasting Halox electrochemical technology with Plaintiff's unique ion exchange technology.

39. Soon after the closing of the purchase contemplated by the Asset Purchase Agreement, Defendant Idex, learned of numerous draw backs associated with Halox electrochemical technology. Defendants Idex and Pulsafeeder quickly developed a severe case of "Buyer's Remorse".

40. By July 2003, Defendant Idex had claimed that it has suffered millions of dollars in losses arising from its acquisition of the conventional Halox technology. Defendant Idex alleged it suffered such economic losses including:

a)      To repair the design and operating defects, Idex and HTI have incurred hundreds of thousands of dollars in otherwise unnecessary travel expenses and consultants' fees, as well as substantial retrofit expenses. Further, Idex and HTI have devoted substantial personnel time—more than 4,000 working hours—to remedy or otherwise compensate for the undisclosed flaws in the products embodying the electrochemical technology.

b)      With respect to the non-existent regulatory approval, Idex and HTI were forced to devote substantial resources, attempting to secure the approvals that the third party sellers represented it had or failed to inform Idex were needed.

c)      Because the third party sellers' electrochemical generator products, customers, markets, and regulatory approvals were not as represented, Idex and HTI have incurred operating losses in the millions of dollars.

41.   Defendant Idex further claimed, the third party sellers, omitted to state the following material facts:

a) That there were material problems and disputes with Halox customers;
b) That there had been a material change in the business and operations of the acquired assets due to the deteriorating relationship with customers and technical problems experienced with the electrochemical generator products;

c) That there were defects in design, materials, and manufacture of the acquired electrochemical generator products;

d) That the third party sellers were aware of circumstances that were likely to cause the warranty expenses or other unreimbursed repair, maintenance and replacement expenses of the business to increase in the future.

e) That the third party sellers had not obtained certain regulatory approvals that were necessary for then anticipated applications.

42. In short, Defendants were saddled with the HALOX electrochemical technology purchased just a year and some months earlier. Moreover, Defendants recognized the significant advantages of Plaintiffs' unique technology, particularly, in commercial cooling tower applications..

43. On September 18 through 21, 2002, Plaintiffs again exhibited their unique ion exchange generator technology at the AWT trade show in Orlando, Florida . Defendants Idex, Pulsafeeder and Halox, were also in attendance. Specifically, during the AWT trade show Defendants' representative Paul Beldham requested Plaintiff Richard Sampson to provide a more detailed disclosure of Plaintiffs' unique technology and to demonstrate DWW's generator products to Defendants. Mr. Beldham stated to Mr. Sampson that he would like to find a way for Defendants and Plaintiffs to "work together" and that Idex had a potential acquisition interest in Plaintiffs' technology. Based upon Mr. Beldham's representations, the Sampson Plaintiffs provided Defendants representatives , Marta Broge, Steve Ebersohl and Mr. Beldham with more detailed disclosure of Plaintiffs' technology and proprietary business information during the course of several hours. Such disclosure included significant advantages of Plaintiffs' generator products to the consuming public in the relevant market. At no time did Defendants, or their respective representative, reveal to Plaintiffs their covert agreement and plan to copy Plaintiffs' technology, and for Defendants to claim exclusive patent rights through fraudulent inventorship .

44. Unbeknownst to Plaintiffs, within days of receiving Plaintiffs' AWT trade show disclosure, on September 30, 2002, Defendants representative , DiMascio filed a patent application in the U.S. Patent and Trademark Office Serial No. 10/065,259 (the '259 DiMascio application) claiming exclusive rights and claiming sole inventorship in Plaintiffs' technology. The '259 DiMascio application copied significant portions of Plaintiffs' technology disclosed to Defendants and was filed without informing Plaintiffs. Defendants have subsequently filed, or caused to be filed, other U.S. and foreign patent applications which claim priority and or correspond to the '259 Dimascio application . These patents and applications are collectively referred to as" the DiMascio Patents" and are set forth in Exhibit "1" hereto.

45. Shortly after the Orlando AWT trade show, Paul Beldham , telephoned Plaintiff Richard Sampson to express Defendants' interest in utilizing Plaintiffs' technology for cooling tower applications. Specifically, Mr. Beldham stated that Defendant IDEX believed DWW's products to be synergistic with Defendants' Halox generator products rather than competitive. Mr. Beldham further indicated IDEX was interested in purchasing DWW's products for resale; obtaining a license from Plaintiffs to permit Defendants to manufacture Plaintiffs' ion exchange generator products; or for Defendants to acquire Plaintiffs' technology. Mr. Beldham stated his belief that "it would be a good fit" with Defendants' Halox product and would allow Defendants to enter into new segments of the market. Mr. Beldham stated "the cooling tower "market as one commercial application that Defendants would like to exploit with Plaintiffs' technology. At no time during the course of Mr. Beldham's telephone discussion did he reveal to Plaintiffs Defendants' covert agreement and plan to copy Plaintiffs' technology and for Defendants to wrongfully claim such exclusive patent rights.

46. In late November 2002, Paul Beldham again telephoned Plaintiff Richard Sampson

to further express Defendants interest in Plaintiffs' technology.  During the course of Mr.

Beldham's second telephone conversation with Richard Sampson, he requested permission to

have Defendant DiMascio visit Plaintiffs' facilities in San Antonio, Texas.  The stated purpose

for Defendant DiMascio's visit to Plaintiffs' facilities was to further conduct due diligence

before Defendants could reach a license agreement, bundling agreement or outright acquisition

of Plaintiffs' technology.  At no time did Mr. Beldham reveal Defendants' covert agreement and

plan to Plaintiffs, nor did Mr. Beldham reveal that Defendants filed, or caused to be filed,  the

'259 Dimascio application.

47.  On December 18 and 19, 2002  pursuant to Defendants' covert agreement and plan,

DiMascio met with Plaintiffs in  San Antonio, Texas to obtain further disclosure and proprietary

information from the Sampson Plaintiffs relating to Plaintiffs' unique generator product line  and

technology. Defendant DiMascio stated to the Sampson Plaintiffs that his visit and requested

disclosure was for Defendants due diligence in forming a cooperative business arrangement with

Plaintiffs to commercially exploit Plaintiffs' unique technology. Based upon Defendants'

continuing representations, and that of DiMascio,  the Sampson Plaintiffs provided Defendants

with further detailed disclosure of their unique technology , system costs, system components,

system characteristics , pricing structure  and marketing strategy. At no time did Dimascio reveal

Defendants' covert agreement and plan , nor the filing of the '259 Dimascio application.

48.  At all times during the course of the foregoing discussions between Plaintiffs and

Defendants referred to in paragraphs 43 through 47 above, Defendants represented to Plaintiffs

that Defendants were interested in forming a cooperative arrangement with Plaintiffs for

Plaintiffs' technology.  However, at no time during these discussions did Defendants reveal to

Plaintiffs that Defendants had copied,  and were planning to copy,  Plaintiffs' technology for

Defendants to claim exclusive patent rights by fraudulently filing patent applications in the name of Defendant DiMascio identified in Exhibit 1 hereto.

49. In truth, Defendants filed, or caused to be filed, the' 259 Di Mascio application on Septemebr 30, 2002. without notifying Plaintiffs. Defendants then utilized Plaintiffs' technology claimed in the DiMascio patents and/or licensed Plaintiffs' technology to third parties without notifying Plaintiffs. Accordingly Defendants did not reveal, nor share the resulting sales revenue and/or licensing income with Plaintiffs.

50. Defendants made these misrepresentations and omissions, set forth in paragraphs 43 through 49 above, in order to induce Plaintiffs to make detailed disclosures to Defendants related to Plaintiffs' unique technology and applications in product market.

51. Plaintiffs reasonably relied on Defendants' actions and information to their detriment in making such disclosures to Defendants. Defendants each knew that such representations and omissions did not accurately represent the facts concerning Defendants intentions with respect to defrauding Plaintiffs of their technology and its commercial value. Accordingly, those misrepresentations and omissions constitute fraudulent misrepresentation and intentional concealment, and Plaintiffs are each entitled to damages as set forth herein.

52. On April 3, 2003, the '918 Sampson application was published as U.S. Patent Application Publication 2003/0064018A1.

53. In connection with the filing and prosecution of the Dimascio patents, Defendants have presented, or caused to presented, materially false statements to the US Patent and Trademark Office as to DiMascio's sole inventorship of claimed subject matter and Defendants' asserted exclusive ownership and patent rights. Defendants' misrepresentations are contained in Dimascio declarations dated January 25, 2005, July 12, 2006 and February 6, 2007 among other

documents filed in the US Patent and Trademark Office.

## .V.

## CAUSES OF ACTION

## COUNT I

### Addition of Inventors Pursuant to 35 U.S.C. § 256
### (The Plaintiffs - Against All Defendants)

1. The Plaintiffs incorporate the allegations in paragraphs 1 through 53 as if fully set forth herein.

2. Defendant DiMascio is not the true and only inventor of the DiMascio Patents. The Sampson Plaintiffs each also contributed in a substantial way to the conception of at least one claim of each of the DiMascio Patents. The failure to include the Sampson Plaintiffs as additional inventors was without deception on the part of Plaintiffs.

3. The Sampson Plaintiffs were unaware that Defendant DiMascio had obtained patent protection on their invention until after the '259 DiMascio applicationissued as a patent on July 5, 2005. Further, Plaintiffs were not aware that subsequent filings of DiMascio patents had been made by Defendants until the respective publication dates of such DiMascio patents as set forth in Exhibit 1. Defendant DiMascio did not inform the U.S. Patent and Trademark Office ("USPTO") of the substantial contributions to the claimed invention made by the Sampson Plaintiffs.

4. Plaintiffs Allison Sampson and Richard Sampson should be added as named inventors of the DiMascio Patents; Plaintiff Dripping Wet Water ("DWW") should be added as an assignee on the DiMascio Patents; Plaintiffs Allison Sampson and Richard Sampson should be added as named inventors on any pending reissue, continuation-in-part, reexamination, or divisional

Plaintiffs' Original Complaint                                                        Page 14

application claiming priority from the DiMascio Patents or any other application from which the DiMascio Patents claim priority or any patent application currently filed or that will be filed claiming exclusive right to the technology disclosed and claimed in Plaintiffs' patent application 09/919,918; and require that Defendants take all action required to name Plaintiffs Allison Sampson and Richard Sampson as applicants on any foreign counterpart patents to the DiMascio Patents or on any pending or future foreign counterpart applications thereto; and to recover damages for Defendants' failure to name the Sampson Plaintiffs as joint inventors on the DiMascio Patents as they are rightfully entitled under the patent laws.

## COUNT 2

### Declaratory Judgment of Ownership Interest in the DiMascio Patents and/or Right to use Patents – (Against All Defendants)

1.  The Plaintiffs incorporate the allegations in paragraphs 1 through 53 and 2 through 4 of Count 1, as if fully set forth herein.

2.  Plaintiffs seek a declaratory judgment that Plaintiffs have an ownership interest in and to the DiMascio Patents and/or right to use such patents.

3.  This cause of action arises under the patent laws of the United States, 35 U.S.C. § 1 <u>et seq.</u>

4.  There is a substantial and continuing justifiable controversy between Defendants on the one hand, and Plaintiffs on the other, as to Plaintiffs' ownership interest in and to the DiMascio Patents and/or right to use the DiMascio Patents.

5.  Defendants deny that Plaintiffs have any ownership interest in and/or right to use the DiMascio Patents.

6.  Plaintiff Sampsons have made significant contributions to the aforementioned

Plaintiffs' Original Complaint                                                                 Page 15

technology. On information and belief, Defendants received and utilized these contributions made by Plaintiffs.

7. Plaintiffs and Defendants Idex, Pulsafeeder and Halox are also parties to a Settlement Agreement that provides, in pertinent part, as follows:

"This Settlement Agreement (the "Agreement") is entered into as of the 26th day of May, 2006, by and between Halox Technologies, Inc. Idex Corporation, and Pulsafeeder, Inc. (collectively, the "Halox Parties"), on the one side, and Dripping Wet Water, Inc., Richard L. Sampson, and Allison H. Sampson (collectively, the "DWW Parties"), on the other side. The Halox Parties and DWW Parties are collectively referred to as the Parties to this Agreement.

<u>RECITALS</u>

1. The Halox Parties and DWW Parties are parties to an action entitled *Halox Technologies, Inc. v. Dripping Wet Water, Inc., Richard L. Sampson, and Allison H. Sampson,* presently pending in the United States District Court for the District of Connecticut as Case No. 3:03CV1009.(the "Litigation".)

\*       \*       \*

4. <u>Declaration of Ownership</u>. The Halox Parties acknowledge and agree that DWW is the owner of patent application 09/919,918..."

8. The above-mentioned action was dismissed with prejudice by Order filed June 6, 2006.

9. The totality of the circumstances surrounding Plaintiffs' technology claimed in the DiMascio patents, and the activities respecting that technology, demand that each Plaintiff be declared as an owner of the DiMascio Patents and that each Plaintiff be allowed to use that technology.

10. Defendants' claim of ownership of Plaintiffs' technology as set forth in the DiMascio Patents is vigorously disputed by Plaintiffs.

11. Absent a declaration of rights by this Court, the assertions made by Defendants will subject Plaintiffs to continuing uncertainty and damages to its business. To resolve the legal and factual questions raised by Plaintiffs and to afford relief from uncertainty and controversy which the assertions made by Defendants have precipitated, Plaintiffs are entitled to declaratory

judgment of its rights under 28 U.S.C. §§ 2201 and 2202.

## COUNT 3

### Unjust Enrichment – (The Plaintiffs - Against All Defendants)

1. The Plaintiffs incorporate the allegations in paragraphs 1 through 53, 2 through 4 of
Count 1, and 2 through 11 of Count 2, as if fully set forth herein. The claim as asserted herein is
ancillary to the federal declaratory judgment count above and arises from the same transactions
and from a common nucleus of operative facts.

2. Plaintiffs are each a co-owner of the DiMascio Patents founded upon their respective
rights under the patent laws and the general principles of estoppel, equity and implied license.

3. Upon information and belief, Defendants have provided third parties with a license to
the DiMascio Patents and have otherwise illegally utilized Plaintiffs' technology without consent
and by selling products based on Plaintiffs' technology.

4. Defendants' failure to include Plaintiff Sampsons as inventors, and omitting Plaintiff
DWW as an assignee, has caused Plaintiffs to suffer damages.

5. Defendants' failure to include Plaintiff Sampsons as inventors, and omitting Plaintiff
DWW as an assignee, has caused Defendants to be unjustly enriched.

6. As a direct and proximate result of Defendants' tortious activities as described herein,
Plaintiffs have sustained and will sustain the injuries herein described.

7. Defendants' tortious activities were done knowingly, willfully and maliciously and
with the intent to injure and oppress Plaintiffs, and therefore, Plaintiffs are entitled to recover
exemplary and punitive damages.

8. Defendants' claimed exclusive rights in Plaintiffs' technology is baseless.

9.  The actions taken by Defendants to copy and claim exclusivity to Plaintiffs' technology were specifically intended to harm Plaintiffs and customers and restrain trade in the relevant markets.

10.  On information and belief, Defendants have sought to illegally assert exclusive patent rights in the subject matter claimed in the DiMascio Patents beyond any legitimate coverage of the issued claims, to intimidate and prevent competitors, including Plaintiff DWW, from competing in the relevant markets.

## COUNT 4

### Fraud and Intentional Concealment
### (The Plaintiffs - Against All Defendants)

1.  Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 53, 2 through 4 of Count 1, 2 through 11 of Count 2, and 2 through 10 of Count 3, of this complaint with the same force and effect as if set forth herein in their entirety.  The claim as asserted herein is ancillary to the federal declaratory judgment count above and arises from the same transactions and from a common nucleus of operative facts.

2.  During the course of discussions set forth in paragraphs 43-47, Defendants represented to Plaintiffs that Defendants were interested in forming a cooperative arrangement with Plaintiffs for Plaintiffs' technology, which representations were false at the time they were made.  Defendants knew that such representations were false when Defendants made them, and/or Defendants made such representation recklessly and without regard for the truth.  Defendants intended that Plaintiffs would rely on such representations.  Plaintiffs reasonably relied on Defendants' representations to Plaintiffs' material detriment.

3.  Defendants intentionally failed to disclose material facts that were known only to

Defendants and that Plaintiffs could not have discovered.  At no time during these discussions set

forth in paragraphs 43-47, did Defendants reveal to Plaintiffs that Defendants had copied, and

were planning to copy, Plaintiffs' technology for Defendants to claim exclusive patent rights by

fraudulently filing patent applications in the name of Defendant DiMascio identified in Exhibit 1

hereto.  Plaintiffs did not know of the concealed facts.  Defendants intended to deceive Plaintiffs

by concealing the facts as set forth herein.  Plaintiffs reasonably relied on Defendants' deception

to their detriment.

4.  As a direct and proximate result of Defendants' tortious activities as described herein,

Plaintiffs have sustained and will sustain the injuries herein described.

5.  Defendants' tortious activities were done knowingly, willfully and maliciously and

with the intent to injure and oppress Plaintiffs, and therefore, Plaintiffs are entitled to recover

exemplary and punitive damages.

6.  Defendants' claimed exclusive rights in Plaintiffs' technology is baseless.

7.  The actions taken by Defendants to copy and claim exclusivity to Plaintiffs'

technology were specifically intended to harm Plaintiffs and customers and restrain trade in the

relevant markets.

8.  On information and belief, Defendants have sought to illegally assert exclusive patent

rights in the subject matter claimed in the DiMascio Patents beyond any legitimate coverage of

the issued claims, to intimidate and prevent competitors, including Plaintiff DWW, from

competing in the relevant markets.

9.  Plaintiffs reliance on Defendants' representations and concealments set forth in

paragraphs 43 through 47 above, were a substantial factor in causing Plaintiffs' harm.

10.  Plaintiffs have incurred attorney fees and other related expenses in having to respond

to Defendants' false and deceptive assertion of exclusive rights to the subject matter claimed in the DiMascio patents and Defendants have been unjustly enriched.

## COUNT 5

### Unfair Competition
### (Plaintiff DWW – Against All Defendants)

1. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 53; 2 through 4 of Count 1; 2 through 11 of Count 2, 2 through 10 of Count 3, and 2 through 10 of Count 4 of this complaint with the same force and effect as if set forth herein in their entirety. The claim as asserted herein is ancillary to the federal declaratory judgment count above and arises from the same transactions and from a common nucleus of operative facts.

2. Defendants' acts constitute unfair competition in Texas and other states where Defendants sell, offer, and/or advertises its goods, including this District, and is a violation of the common law of Texas, and laws of other states, by reason of which Plaintiff DWW has suffered, and will continue to suffer, irreparable injury.

3. As a direct and proximate result of the violations alleged herein, Plaintiff DWW has been, and will continue to be immediately and irreparably injured in its business and property by Defendants' continuing violations. Plaintiff DWW have no adequate remedy at law to compensate for such injury, and unless Defendants are restrained by an appropriate order of this Court, Plaintiff DWW will continue to suffer an inability to compete fully and fairly in the market, loss of its revenues, loss of profits it would other have made, loss of substantial goodwill and reputation normally attached to a profitable enterprise, and a reduction in the value of its business as a going concern.

4. As a direct and proximate result of the violations alleged herein and as intended by

Plaintiffs' Original Complaint                                              Page 20

Defendants, Plaintiff DWW has sustained injury to its business and property, as follows:

  (a) It has incurred attorneys' fees in connection with Defendants' claimed exclusivity described above;

  (b) It has lost or will lose profits in an amount as yet undetermined with certainty at present;

  (c) It has suffered, or will suffer a loss in the value of its business as a going concern;

  (d) It has suffered, or will suffer a substantial loss of goodwill normally attached to a profitable enterprise; and

  (e) It has suffered a lost potential for growth.

  5. Plaintiff DWW cannot now measure these damages with specificity.  When Plaintiff DWW has sufficient information to permit it allege with specificity the quantum of its damages, Plaintiff DWW will ask leave of the Court to amend its Complaint to insert said sum herein.

# VI.
## PRAYER FOR RELIEF

*For the Reasons alleged,* Plaintiffs respectfully pray this Court grant the following relief:

  1. A declaration pursuant to 35 U.S.C. § 256, that the Sampson Plaintiffs should be added as inventors on the DiMascio Patents and corresponding applications filed in the US or foreign countries.  In addition, Plaintiff DWW should be added as an assignee of the DiMascio Patents;

  2. A declaration that Plaintiffs each have an ownership interest in and to the DiMascio Patents and/or has a right to use such patents;

  3. A declaration this case as exceptional within the meaning of 35 U.S.C. § 285 and that this Court award Plaintiffs their attorney's fees and costs;

  4. As to Counts 3, 4, and 5, award Plaintiffs damages in an amount sufficient to compensate each Plaintiff for harm suffered.

  5. As to Count 4,  Plaintiffs are entitled to recover exemplary and punitive damages

Plaintiffs' Original Complaint                      Page 21

against each Defendant for their acts committed knowingly, willfully and maliciously and with

the intent to injure and oppress Plaintiffs.

      6.  An award to Plaintiffs for their reasonable attorneys' fees and costs and prejudgment

and post judgment interest,

      7.  An injunction against Defendants for engaging in acts which constitute unfair

competition in Texas or affecting interstate commerce.

      8.  Award such further relief as the Court deemed just and necessary.

### DEMAND FOR JURY TRIAL

      Plaintiffs hereby request a trial by jury.

John C. Cave
GUNN & LEE, P.C.
700 N. St. Mary's Street
   Suite 1500
San Antonio, Texas  78205
Tele:  210/886-9500
Fax:  210/886-9883

OF COUNSEL:

Frank Frisenda (Pro Hac Vice Pending)
FRISENDA, QUINTON & NICHOLSON
11601 Wilshire Blvd., Suite 500
Los Angeles, California  90025
Tele:  702/792-3910
Fax:  702/486-4176

Attorneys for Dripping Wet Water,
Allison Sampson and Richard Sampson

Plaintiffs' Original Complaint