# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

DRIPPING WET WATER, INC., et al.　　　)
　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
VS.　　　　　　　　　　　　　　　)　　Civil Action No:  SA-07-CA-531-XR
　　　　　　　　　　　　　　　　　)
IDEX CORPORATION, et al.　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　)

**ORDER**

This case involves a dispute over the acquisition and use of certain chlorine dioxide technologies. Plaintiffs have pled patent-related federal law claims, along with state law claims for unjust enrichment, fraud and intentional concealment, and unfair competition. Defendants filed a motion to dismiss (Docket No. 13) asserting improper service, lack of personal jurisdiction, and the affirmative defense of res judicata. Plaintiffs responded, and Defendants filed a reply. For the reasons stated herein, Defendants' motion to dismiss is GRANTED.

**Factual Overview**

Plaintiffs are Dripping Wet Water, Inc. (DWW) and Allison and Richard Sampson, the president and vice president of DWW, respectively. DWW manufactures and sales chlorine dioxide generators and related products. Chlorine dioxide is a biocide used in a variety of disinfection applications and is especially noted for its use with water treatment.

Defendants are IDEX Corporation (IDEX), Halox Technologies, Inc. (Halox), Pulsafeeder, Inc. (Pulsafeeder), and Felice DiMascio (DiMascio). The three companies are or were involved in manufacturing and distributing chlorine dioxide generators, and DiMascio was an employee for Halox during the time period at issue.

1

Plaintiffs allege that certain patents for chlorine dioxide technologies improperly list DiMascio as the only inventor, when both Allison and Richard Sampson made significant contributions to the inventions. As alleged co-inventors of these technologies, Plaintiffs assert an ownership interest in the patents.

Plaintiffs further allege claims of unjust enrichment, fraud and intentional concealment, and unfair competition. Specifically, Plaintiffs aver Defendants impermissibly copied their inventions from Plaintiffs' technology, gaining access to the technology by fraudulently leading Plaintiffs to think they were interested in forming genuine business partnerships. Plaintiffs also assert that Defendants continue to falsely advertise that they hold the exclusive rights to the challenged patents, causing foreseeable and substantial damages to Plaintiffs' business interests.

## Analysis

### Standard for Motion to Dismiss

In determining the merits of a 12(b)(6) motion to dismiss, the Court must accept "all well-pleaded facts as true and . . . view them in the light most favorable to the plaintiff."[1] Moreover, the Court "may not look beyond the pleadings" in ruling on the motion.[2] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to state a claim to relief that is plausible on its face."[3] In other words, "factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint

---

[1] McCartney v. First City Bank, 970 F.2d 45, 47 (5th Cir. 1992).

[2] Id.

[3] In re Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007).

are true (even if doubtful in fact)."[4]

Service of Process

      In their motion to dismiss, Defendants allege Plaintiffs served them improperly by

certified mail. In response, Plaintiffs re-served Defendants by personal service to eliminate a

service dispute. According to Defendants in their reply, however, DiMascio was not personally

served, but rather, received service via certified mail to his parents' address.[5]

      FED. R. CIV. P. 4(e)(1) states that an individual may be served by "following state law for

serving a summons in an action brought in courts of general jurisdiction in the state where the

district court is located or where service is made." Tex. R. Civ. P. 103 states that process may be

served by "any person authorized by law or by written order of the court who is not less than

eighteen years of age." Tex. R. Civ. P. 106 builds on Rule 103 by providing that service may be

made by "mailing to the defendant by registered or certified mail, return receipt requested, a true

copy of the citation with a copy of the petition attached thereto."

      The defect in service asserted by Defendants could easily be cured by the Court ordering,

pursuant to Federal Rule 4(e)(1) and Texas Rules 103 and 106, that Plaintiffs' counsel may serve

Defendant DiMascio by certified mail. The Court does not take this step, however, because it

lacks personal jurisdiction over Defendants.

Status of Halox Technologies, Inc.

      Before proceeding to personal jurisdiction, the Court considers Defendants' argument that

Halox cannot be sued because it no longer exists. In support of their position, Defendants cite to

---

[4] Bell Atlantic Corporation v. Twombly, 127 S.Ct. 1955, 1965 (2007).

[5] *See* Docket No. 26 at 2, n. 2.

language in the Fifth Circuit case of *Cornish v. Texas Board of Criminal Justice Office of the Inspector General* that reads "a Texas defendant may only be sued if it has an actual or legal existence."[6]

*Cornish* involves a suit where one of the named defendants is the Texas Board of Criminal Justice Office of the Inspector General. As the court observes, "the Texas Government Code establishes the Texas Board of Criminal Justice, but it does not establish the Office of Inspector General as a separate entity."[7] As a result, no claim can stand against the Texas Board of Criminal Justice Office of the Inspector General because it has no "actual or legal existence."[8]

Here, though, the issue is not whether Plaintiffs can sue an office that never existed as a separate entity, but rather, whether they can sue a corporation that used to exist as a separate legal entity, but now is merged into a new corporation.

On July 28, 2006, Halox, along with Eastern Plastics, a corporation organized and incorporated under the laws of Connecticut, filed a certificate of merger with Delaware, Halox's state of incorporation, in which Halox was merged "with and into" Eastern Plastics.[9] According to Connecticut law,[10] "a successor," which in this case would be Eastern Plastics, "assumes its

---

[6] Docket No. 13 at 4-5 (citing to Cornish v. Texas Board of Criminal Justice Office of the Inspector General, 141 Fed. Appx. 298, 299 (5th Cir. 2005).

[7] *Cornish*, 141 Fed. Appx. at 299.

[8] *Id.*

[9] Docket No. 13 at Exhibit D.

[10] The other problem with Defendants' argument is that it relies on Texas law. Neither of the merged companies, however, were incorporated in Texas, so Texas law does not determine whether and how Halox remains liable for its alleged pre-merger actions.

4

predecessor's liabilities if . . . there was a merger or consolidation of the two firms."[11] Moreover, the "actions and conduct of a constituent corporation may be attributed to the surviving corporation following a merger for purposes of determining the surviving corporation's amenability to personal jurisdiction for liabilities incurred by the constituent corporation."[12]

Therefore, to pursue their claims against Halox, Plaintiffs would need to amend their complaint to name Eastern Plastics, Inc. as a Defendant. While a necessary legal step, such amendment would not alter the facts presented in the present complaint or in Plaintiffs' response to Defendants' motion to dismiss for lack of personal jurisdiction. Accordingly, the Court will consider whether Plaintiffs have met their burden of showing that personal jurisdiction would have extended to Halox, and thus via the merger and Connecticut law, should now extend to Eastern Plastics, the successor corporation.[13]

Personal Jurisdiction - Overview

As an initial matter, "when a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident. The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized

---

[11] Union Square Grill Hospitality Group v. Blue Smoke American Bar & Grill, 2007 WL 869024 at 2 (D. Conn. 2007).

[12] Betensky v. Opcon Associates, Inc., 46 Conn. Supp. 110, 116 (Conn. Super 1999).

[13] Plaintiffs have pled no facts that suggest that apart from Halox's alleged actions pre-merger, Eastern Plastics's contacts with Texas, if any, relate to the underlying causes of action. Thus, the Court is fully able to consider whether specific jurisdiction exists based on the pleadings, affidavits, and exhibits before it. As for general jurisdiction, while the Court finds that such jurisdiction would not have extended to Halox, it recognizes that there is no briefing on whether general jurisdiction exists over Eastern Plastics.

5

methods of discovery."[14] In so doing, the court must resolve relevant factual disputes in the

plaintiff's favor, and the plaintiff "need only plead a prima facie case for personal jurisdiction."[15]

In cases dealing substantively with patent law, courts apply the law of the Federal Circuit

in determining whether personal jurisdiction exists.[16] Under the law of the Federal Circuit, a

court may assert jurisdiction if: 1) service of process is proper under the state's long-arm statute,

and 2) due process is satisfied under the Fourteenth Amendment.[17]

In Texas the state long-arm statute provides a court with "personal jurisdiction over a

foreign defendant to the fullest extent allowed by the federal constitution."[18] Accordingly, "the

usual two-step analysis reduces to one step, and we consider whether exercising jurisdiction over

[the Defendants] is consistent with the Due Process Clause of the Fourteenth Amendment."[19]

As the Fifth Circuit has said, "the Due Process Clause of the Fourteenth Amendment

permits the exercise of personal jurisdiction over a nonresident defendant when 1) that defendant

has purposefully availed himself of the benefits and protections of the forum state by establishing

'minimum contacts' with the forum state; and 2) the exercise of jurisdiction over that defendant

does not offend 'traditional notions of fair play and substantial justice.'"[20] The court went on to

---

[14] Allred v. Moore & Peterson, 117 F.3d 278, 281 (5th Cir. 1997).

[15] Fielding v. Hubert Burda Media, Inc., 415 F.3d 419, 424 (5th Cir. 2005).

[16] See Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1358 (Fed. Cir. 1998).

[17] See Hildebrand v. Steck Manufacturing Co., Inc., 279 F.3d 1351, 1354 (Fed. Cir. 2002).

[18] Alpine View Co. Ltd. v. Atlas Copco AB, 205 F.3d 208, 214 (5th Cir. 2000).

[19] Id.

[20] Mink v. AAAA Development LLC, 190 F.3d 333, 336 (5th Cir. 1999).

state that "minimum contacts . . . can be established through contacts that give rise to specific personal jurisdiction or those that give rise to general personal jurisdiction."[21]

General personal jurisdiction will "attach where the nonresident defendant's contacts with the forum state, although not related to the plaintiff's cause of action, are 'continuous and systematic.'"[22] As the holding in the Supreme Court case of *Helicopteros Nacionales de Colombia, S.A. v. Hall*[23] and its lower court progeny demonstrate, to qualify for general jurisdiction, "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there."[24] Defendants' contacts with Texas do not rise to such a level, meaning that if there is personal jurisdiction, it must be specific personal jurisdiction.

In "deciding whether [specific] personal jurisdiction is consistent with the Due Process Clause," the Court considers "1) whether the defendant has minimum contacts with the forum state . . . [and] 2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts."[25] If a plaintiff makes a prima facie showing of facts that meets these two requirements, then the "burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable."[26]

---

[21] *Id.*

[22] *Alpine View*, 205 F.3d at 215.

[23] 466 US 408 (1984).

[24] 4 Fed. Prac. & Proc. Civ.3d § 1067.5.

[25] Nuovo Pignone, SpA v. Storman Asia M/V, 310 F.3d 374, 378 (5th Cir. 2002).

[26] *Id.* at 378, 382.

Minimum Contacts - Overview

"A defendant establishes minimum contacts with a state if the defendant's conduct and connection with the forum state are such that [it] should reasonably anticipate being haled into court there."[27] The defendant must engage in some act whereby it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws . . . Even where a defendant has no physical presence in the forum state, a single purposeful contact is sufficient to confer personal jurisdiction if the cause of action arises from the contact."[28]

Minimum Contacts - Halox Technologies

Halox Technologies, a Delaware corporation that had its principal place of business in Connecticut, merged into Eastern Plastics, a Connecticut corporation. During the period of October 9 through October 13, 2001, Plaintiffs exhibited their chloride dioxide generator products at a trade show in Dallas, Texas. As part of the exhibition, Plaintiffs distributed marketing literature explaining the advantages of their new ion exchange technology. Plaintiffs allege that "Defendants," without specifying which Defendants in particular, "attended the 2001 AWT [Association of Water Technologies] Expo and received Plaintiffs' literature which disclosed Plaintiffs' unique technology."[29] Plaintiffs go on to acknowledge, however, that Defendant Idex did not acquire the business assets that would become Halox until March 2002.[30]

---

[27] *Id.* at 379.

[28] *Id.*

[29] Docket No. 3 at 8.

[30] *Id.* at 8-9.

Because Plaintiffs do not allege that the unnamed "third party sellers" that sold the "Halox Electro-Chemical Technology" made contact with them during the 2001 trade show,[31] any contacts made by other Defendants at that Texas event cannot be attributed to Halox for purposes of establishing specific jurisdiction.

Plaintiffs next allege that at a trade show in Florida from September 18 through 21, 2002, "Defendants Idex, Pulsafeeder, and Halox" were in attendance.[32] During the course of this event, Paul Beldham, a man identified by Plaintiffs simply as "Defendants' representative," supposedly asked Plaintiff Richard Sampson "to provide a more detailed disclosure of Plaintiffs' unique technology and to demonstrate DWW's generator products to Defendants."[33] In response to this request, Plaintiffs contend they spent several hours discussing their new technologies with Marta Broge, Steve Ebersohl, and Paul Beldham, all of whom are described as "Defendants' representatives."[34]

Even assuming one of these Defendants was associated with Halox, the event in question took place in Florida. Plaintiffs do not allege they had further communications with any of the Defendants, including Halox, between the end of the Florida trade show on September 21st and the submission on September 30th of a patent application by DiMascio, who at the time was allegedly employed by Halox. Hence, when the so-styled 259 DiMascio patent application was filed, Defendant Halox had yet to establish any contacts with Texas related to the causes of

---

[31] *See Id.*

[32] *Id.* at 10.

[33] *Id.*

[34] *Id.*

9

action pled by Plaintiffs.

Plaintiffs do aver that Paul Beldham called them in November 2002 to further discuss business opportunities and to arrange for DiMascio to visit their San Antonio facilities. Furthermore, on December 18 and 19, 2002, DiMascio visited Plaintiffs in San Antonio, touring their offices and discussing more in-depth the technologies, business practices, and marketing strategies they employed. Because DiMascio was employed by Halox at this time, his visit to San Antonio for the exclusive purpose of meeting with Plaintiffs, investigating their technical processes and business operations, and exploring the potential for future business partnerships between Plaintiffs and his employer is sufficient to show that Halox purposefully directed its activities toward Texas in a manner that would, but for one missing requirement, meet the minimum contacts requirement.

The missing requirement is that for specific jurisdiction, Plaintiffs must show that their causes of action arise out of or result from Halox's contacts with Texas.[35] They cannot do this because Halox's contacts with Texas occurred **after** the time period in which a contact could have given rise to Plaintiffs' federal patent-related claims, and thus by extension, to Plaintiffs' connected state law claims. Plaintiffs have pled two federal law claims: one for addition of patent inventors under 35 U.S.C. § 256 and another for declaratory judgment of ownership interest in the DiMascio patents. Plaintiffs' remaining claims for unjust enrichment, fraud and intentional concealment, and unfair competition are state law causes of action that Plaintiffs' contend are "ancillary to the federal declaratory judgment count" and arise "from the same transactions and

---

[35] *Nuovo Pignone*, 310 F.3d at 381-2.

10

from a common nucleus of operative facts."[36]

Although Plaintiffs assert patent-related claims for patents filed over a period of time stretching from September 30, 2002 through August 11, 2006,[37] they focus almost exclusively on the first patent, known as the 259 DiMascio patent. They allege that the "259 DiMascio application copied significant portions of Plaintiffs' technology disclosed to Defendants and was filed without informing Plaintiffs."[38] As for the patents that followed, Plaintiffs merely assert that "Defendants have subsequently filed, or caused to be filed, other U.S. and foreign patent applications which claim priority and/or correspond to the 259 DiMascio application."[39]

Indeed, Plaintiffs make no factual assertions about their rights to the post 259 DiMascio patents other than implying that their rights in these patents stem from the patents' reliance on technology allegedly obtained impermissibly by Defendants **prior** to their filing of the 259 DiMascio patent. Therefore, if Plaintiffs have not met their personal jurisdiction burden with respect to the 259 DiMascio patent, they will not be able to meet such burden for the later-filed patents.

Stated simply, Defendants' Texas contacts after September 30, 2002 cannot give rise to Plaintiffs' causes of action for the later patents because there is no allegation that those patents are based on technologies other than the ones allegedly obtained improperly prior to the filing of the 259 DiMascio patent. Thus for all the patents and their related state law claims, the only

---

[36] Docket No. 3 at 17, 18, and 20.

[37] *Id.* at Exhibit 1.

[38] *Id.* at 11.

[39] *Id.*

relevant forum state contacts would be those that took place before September 30, 2002 when the

259 DiMascio patent application was filed. Because Plaintiffs have failed to establish that Halox

had any contacts with Texas prior to September 30, 2002, they cannot meet their specific

jurisdiction burden of showing that their patent-related causes of action arise out of or result from

Halox's contacts with Texas.

Minimum Contacts - DiMascio

Defendant DiMascio is domiciled in Connecticut. During the time period pertinent to this

suit, DiMascio was an employee of Halox, which had its principal office in Connecticut.

Plaintiffs make no allegations of DiMascio having relevant contacts with Texas until his visit to

San Antonio in December 2002. Because that date comes after September 2002, the filing date

for the 259 DiMascio patent, Plaintiffs fail, for the reasons stated above as to Halox, to show

how DiMascio's contacts with Texas give rise to their patent-related causes of action.

Minimum Contacts - IDEX

Defendant IDEX is a Delaware corporation with its principal place of business in Illinois.

According to Plaintiffs, it is a "holding company that owns numerous separately incorporated

businesses," including previously Halox.[40]

Unlike with Halox and DiMascio, Plaintiffs do allege that IDEX had contact with Texas

before September 30, 2002. That contact was limited, however, to presence at a 2001 trade show

in Dallas that was sponsored by the Association of Water Technologies. While there, IDEX

purportedly received free marketing literature from Plaintiffs that discussed Plaintiffs'

technology.

---

[40] *Id.* at 1.

12

IDEX disputes that any of its employees were present at the Dallas trade show. Craig

Boyd, deputy general counsel and assistant secretary for IDEX, submitted an affidavit in which

he attests that he is "unaware of any IDEX or Pulsafeeder employees attending the 2001

Association of Water Technologies trade show identified by Plaintiffs in their Amended

Complaint."[41]

Even assuming IDEX employees were at the trade show, the remainder of IDEX's alleged

contacts with Texas, all of which occurred after September 2002, could not, for the reasons

articulated above, be reasonably viewed as giving rise to Plaintiffs' causes of action. Thus, for

purposes of meeting the minimum contacts test, all Plaintiffs have to work with is IDEX's

purported appearance at a trade show. Although this contact is relevant to the patent intervention

and usage claims asserted by Plaintiffs, along with the related state law tort claims, one

attendance at a trade show where its employees picked up free marketing materials at a vendor's

exhibit is insufficient to show that IDEX "purposefully avail[ed] itself of the privilege of

conducting activities within the forum state, thus invoking the benefits and protections of its

laws."[42]

Minimum Contacts - Pulsafeeder

Defendant Pulsafeeder is a Delaware corporation with its principal place of business in

Illinois. Like IDEX, its only relevant contact with Texas for purposes of specific jurisdiction is

its alleged presence at the 2001 Dallas trade show. For the reasons stated above with respect to

IDEX, this contact is not enough to provide the Court with personal jurisdiction.

---

[41] Docket No. 13, Affidavit of Craig T. Boyd.

[42] *Nuovo Pignone*, 310 F.3d at 379.

13

<u>Res Judicata</u>

Because the Court does not have personal jurisdiction over the Defendants, it has no basis

on which to consider the res judicata affirmative defense asserted by Defendants.

## Conclusion

The Court lacks personal jurisdiction over Defendants for purposes of Plaintiffs' patent-

related federal and state law claims. Therefore, those claims are dismissed without prejudice, and

the Clerk is instructed to close this case.

It is so ORDERED.

SIGNED this 24th day of April, 2008.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

14

# EXHIBIT D

ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2005 JUN -6  P 3: 46

U.S. DISTRICT COURT
BRIDGEPORT, CONN

HALOX TECHNOLOGIES, INC.,      :

     Plaintiff,      :

     :

V.      :

     :

DRIPPING WET WATER, INC.,      :     No. 3:03cv01008 (SRU)
RICHARD SAMPSON and
ALLISON SAMPSON,      :

     :

     Defendants and Counterclaim Plaintiffs,      :

     :

V.      :

     :

PULSAFEEDER, INC., and      :
IDEX CORP.,      :

     Additional Counterclaim Defendants.      :

     :     June 6, 2005

## COUNTERCLAIM

**Parties**

1.       Counterclaim Plaintiff, Dripping Wet Water, Inc., is a Texas Corporation whose address is 8622 Raintree Woods Drive, Fair Oaks Ranch, Texas 78015.

2.       Counterclaim Plaintiff, Allison Sampson, is an Individual whose address is 8622 Raintree Woods Drive, Fair Oaks Ranch, Texas 78015.

3.       Counterclaim Plaintiff, Richard Sampson., is an Individual whose address is 8622 Raintree Woods Drive, Fair Oaks Ranch, Texas 78015.

4.       Counterclaim Defendant Halox Technologies, Inc., is a  Delaware corporation having a principal place of business at 304 Bishop Avenue, Bridgeport, Connecticut 06610.

5.     Counterclaim Defendant Idex Corporation, is a Delaware corporation having a principal place of business at 630 Dundee Road, Northbrook, Illinois 60062.

6.     Counterclaim Defendant Pulsafeeder Inc., is a Delaware corporation having a principal place of business at 630 Dundee Road, Northbrook, Illinois 60062.

**Jurisdiction and Venue**

7.     Jurisdiction of this Court is based on 28 U.S.C. §1331 and 15 U.S.C. §1121, in that there is a federal question arising under the laws of the United States.  Jurisdiction over the state law claims is conferred by the Court's supplementary jurisdiction, 28 U.S.C. §1367.  There is also an independent basis for jurisdiction over those claims because the parties are of diverse citizenship under 28 U.S.C. §1332 and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.     Venue in Connecticut is proper in this case under 28 U.S.C. § 1391.

**Background**

9.     Counterclaim Plaintiffs Richard Sampson and Allison Sampson are Chemical Engineers.

10.     In 1994, the Sampsons founded a company known as Halox Technologies Corporation ("HTC").

11.     The business of HTC was to manufacture and sell water disinfection equipment.

12.     The principal intellectual property asset of HTC was a patent obtained by Richard

Sampson and Allison Sampson, which was issued in May 1995.

13.     Since the Sampsons lacked the capital to fund their business by themselves, they obtained investment from venture capitalists, who, along with the Sampsons, owned the company.

14.     In or about August, 2000, the venture capitalists terminated the Sampsons' employment with HTC.

15.     In or about March, 2002, assets of HTC were acquired by Counterclaim Defendant Idex Corporation, but the Corporation and business of HTC remained.

16.     Idex, as part of its due diligence in connection with the acquisition, did not meet with the Sampsons.

17.     On or about September 11, 2001, the Sampsons incorporated a new business, Dripping Wet Water, Inc. ("DWW").

18.     The business of DWW would be to manufacture and sell the Sampsons' new invention, which was the subject of a patent application filed in August, 2001.  This invention represented an innovate approach to chlorine dioxide generation for water disinfection.

19.     DWW did not begin any sales or marketing activity until, at the earliest, October, 2001.

20.     On or about October 9-13, 2001, the Sampsons and DWW attended the Association of Water Technologies ("AWT") Tradeshow in Dallas, TX.  This event was

3

essentially the public launch of the Sampsons' new business, DWW.

21.    At the AWT show, DWW had a display booth.  Separately, representatives of both HTC and Idex/Pulsafeeder visited their booth and collected the literature, which clearly explained the technology.

22.    Between October, 2001, and the next AWT show in September, 2002, DWW began to sell products.  Its first commercial sale was achieved on January 16, 2002.

23.    On or about September 18-21, 2002, at the AWT show in Orlando, Florida, DWW once again had a display booth.

24.    Paul Beldham and Steve Ebersohl, who were employed by, and were acting on behalf of, Pulsafeeder and/or Idex, visited the DWW booth.

25.    During their visit to the booth, Beldham approached Richard Sampson and inquired whether DWW would consider exploring a business arrangement with Idex and/or Pulsafeeder, in the form of a joint venture or licensing agreement.  He asked the Sampsons to explain the product more fully to them and to Marta Broge, an Idex employee who had been responsible for the acquisition, by Idex, of Halox.  The Sampsons agreed and made a presentation.

26.    After the AWT show, Beldham followed up with Richard Sampson. Beldham reiterated the Idex group's interest in doing business, whether in the form of a licensing agreement, a joint venture, or an outright acquisition.  Beldham arranged for Felix DiMascio, a Halox employee, to visit the Sampsons and DWW.

4

27.     Beldham represented that the purpose of DiMascio's visit was to perform due diligence as a prelude to a possible business arrangement.

28.     As such, DiMascio, and Halox, were to act, and did act, as agents of Idex and Pulsafeeder.

29.     DiMascio had worked for Allison Sampson in the R & D Department during the period when the Sampsons were at Halox.

30.     DiMascio did in fact visit the Sampsons in Texas for two days in December, 2002.

31.     During his visit, DiMascio had numerous discussions with both Richard and Allison Sampson.

32.     The Sampsons and DWW gave DiMascio their full cooperation, based on Beldham's representations to them that the purpose of the visit was to perform due diligence on the DWW technology to enable Idex to evaluate the prospect of doing business with the Sampsons and DWW.

33.     The Sampsons and DWW allowed DiMascio unfettered access to their manufacturing facility, demonstrated the operation of a unit, and answered his questions about the technology in detail.  DiMascio represented that he was impressed with the product and that he intended to recommend that the two companies do business together.

34.     In January, 2003, Beldham, in a phone conversation with Richard Sampson, represented that from Idex's perspective, DiMascio's visit with the Sampsons had been a success.  He stated that DiMascio gave the DWW product and technology a "glowing report."

35.    During that conversation, Beldham stated that Idex was "still interested" in pursuing a joint venture or license arrangement with the Sampsons and DWW, but for business reasons any transaction would have to be delayed until the third quarter of 2003.

36.    In subsequent conversations during 2003, up to and including approximately June 1, 2003, Beldham continued to assure Richard Sampson that the Idex group was still actively considering doing business with the Sampsons and DWW.

37.    Counterclaim Plaintiffs DWW and the Sampsons have invested substantial time, effort, and sums of money on research, development, trademarks, patents, manufacturing, advertising, promotion, and marketing for the Product, and in the development of public acceptance and goodwill associated with the Product.

38.    After its launch, the Product proved to be a commercial success.  Sales of the domestic Product increased between January 2002 and August 2003.

39.    DWW's entire business was focused on the manufacture and sale of the Product.  In advertising and promotion, DWW and its dealers consistently emphasized the innovative nature of the Product, and in particular the Product's innovation and quality, as well as its cost-saving and safety features.

**The Idex Group Disparages the DWW Product**

40.    DiMascio, upon his return from visiting the Sampsons and DWW in Texas, created a "report" of his visit.

41.     Also in 2003, Halox created a "Powerpoint" presentation, based, in whole or in part, on DiMascio's report, which purported to compare the DWW product and technology to the Halox product and technology.

42.     Beginning in approximately April, 2003, and continuing through at least August, 2003, Halox began distributing and disseminating both the DiMascio report and the Powerpoint presentation (together, the "Marketing Materials") to sales representatives and, either directly or indirectly, to prospective and actual customers.

43.     These prospective actual customers were prospective purchasers not only of the Halox product but also the competitive DWW product.

44.     The Marketing Materials contain false, inaccurate and misleading data and information.

45.     The Marketing Materials give the appearance that the Product was not effective, when in fact the Product was and is effective. Moreover, the Report impugns the legitimacy of DWW's own claims about the performance of its Product.

46.     DiMascio, who had worked under Allison Sampson in the HTC lab, harbored a belief—unbeknownst to Counterclaim Plaintiffs—that the Sampsons' new invention somehow relied on his own work. Indeed, in September 2002, after the AWT Show, DiMascio, with the consent and approval of Halox, filed a patent application by which he claimed the Sampsons' invention as his own. Accordingly, DiMascio, who made this view known to Halox, Pulsafeeder, and Idex, was biased against the Sampsons. Therefore, his investigation was ill-suited to provide a reasonable and objective basis for an evaluation of the DWW Product's performance.

7

47.     Among the false statements were the following:

a.      That Counterclaim Plaintiff's published chemical equation is incorrect and is actually a

completely different equation.

b.      That Counterclaim Plaintiff's product creates a potential safety hazard.

c.      That as a result of the different equation the cost of operation of the Counterclaim Plaintiff's product is much higher than it actually is.

d.      That Counterclaim Plaintiff's product causes EPA chlorite violations.

e.      That Counterclaim Plaintiff's product lacks safety features.

f.      That Counterclaim Plaintiff's hire laborers by the hour at nights with no benefits to create their product.

48.     By the above listed statements in paragraph 47, Counterclaim Defendants meant, and were understood by all persons reading or hearing these words to mean, that the Counterclaim Plaintiff's business uses the wrong formula to create its product and as such, manufactures a costly and unsafe product and that the quality of the product is poor, and further, the means by which the product is created is in violation of the laws of the United States and of the State of Texas.

49.     The above specified words were read by Jim Lukanich at ChemCal, and by diverse persons.

50.     Furthermore, during this time, Counterclaim Defendants did publish orally, among other false statements, the following false statements regarding the Counterclaim Plaintiffs:

a.      That Dripping Wet Water, Inc., Allison Sampson and Richard Sampson stole the technology they are using from Halox; and

8

b.    That Dripping Wet Water, Inc., Allison Sampson and Richard Sampson are going to lose their patent on their technology.

51.    By the words listed above in paragraph 50, Counterclaim Defendants meant, and were understood by all persons hearing these words to mean that the Counterclaim Plaintiffs are thieves, and liars, and do not own the rights to their product legally, but, rather, had stolen Halox's property.

51.    The above specified words were heard by Keith Kennedy and Carl Groenewegen at JohnsonDiversey, and by diverse persons.

52.    Counterclaim Plaintiffs further allege that the Counterclaim Defendants Pulsafeeder, Inc. and Idex Corporation, in addition to their conduct in arranging, under false pretenses, for DiMascio to visit the Sampsons and DWW, as their agent, have also ratified, approved and condoned the acts of Halox both expressly and impliedly.

**FIRST COUNT**  (Product Disparagement under the Lanham Act)
(against all Counterclaim Defendants)

1-52.    Paragraphs 1-52 of the Complaint are hereby repeated and realleged as if fully set forth herein.

53.    The Marketing Materials' claimed description of the properties of the DWW product shows characteristics far inferior to that of the actual properties and performance of the Product.

54.    The efficiency and safety properties of the Product are perceived by consumers of these products to be a very important factor in the buying decision.

55.    Counterclaim Defendants' representations concerning the quality and inherent characteristics of Counterclaim Plaintiffs' Product are false and misleading.

56.    Counterclaim Defendants' representations concerning Counterclaim Plaintiffs' Product are false or misleading descriptions or representations in connection with goods in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

57.    In commercial advertising or promotion, Counterclaim Defendants' representations concerning Counterclaim Plaintiffs' Product misrepresent the nature, characteristics and qualities of Counterclaim Plaintiffs' goods, in violation of 15 U.S.C. §1125(a)(2).

58.    Counterclaim Defendants' representations concerning its own products, are false or misleading descriptions or representations in connection with goods or services in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

59.    Counterclaim Defendants' statements actually deceived or have the tendency to deceive a substantial segment of their audience.

60.    Such deception is material, in that statements and misrepresentations of and concerning the Counterclaim Plaintiffs' Product are likely to influence purchasing decisions because purchasers of these products are principally concerned with efficacy, quality, cost, and safety considerations, and because purchasers are likely to be influenced by misrepresentations on these subjects.

61.    Counterclaim Defendants' misrepresentations were used in connection with goods in commerce.

62.    Counterclaim Defendants' misrepresentations have tended to have a substantial effect on DWW's interstate business.

63.    DWW has been, or is likely to be, damaged by the use of Counterclaim Defendants' false descriptions and representations, both by the loss of sales of the product to present and potential customers, and by the loss of goodwill among customers.

**SECOND COUNT    (Product Disparagement/Trade Libel)**
**                (by DWW, against all Counterclaim Defendants)**

1-63.   Paragraphs 1-63 of the Complaint are hereby repeated and realleged as if fully set forth herein.

64.    The publication of the Marketing Materials disparaged the quality of the DWW Product.

65.    Counterclaim Defendants intended for publication of the statements to result in harm to DWW's interests, or either recognized or should have recognized that it was likely to do so.

66.    Counterclaim Defendants knew that the statements were false or acted in reckless disregard of their truth or falsity.

67.    The circumstances under which the publication was made were such as to make reliance upon it by third persons, i.e., DWW's actual and potential customers, reasonably

11

foreseeable because of the claimed scientific investigation of the DWW product made by DiMascio.

68.    The recipients of the publication understood the injurious character of the false statements, in that they viewed the statements of Counterclaim Defendants as directly contradicting DWW's own claims with respect to the advantageous properties of the Product.

69.    The Counterclaim Defendants published disparaging words regarding the character, quality, and ownership of Counterclaim Plaintiff's chattels and/or intangible things, with the knowledge that the publication was false, or with an entire want of care and conscious indifference to the rights of Counterclaim Plaintiff in that the information complained of was published with reckless and heedless disregard for the truth or falsity of the publication and had no factual basis. Counterclaim Defendant intentionally and/or recklessly published these words to cast doubt on and/or a third party reasonably understood these words to cast doubt on Counterclaim Plaintiff's chattels and/or intangible things. Publication of words in such a manner constitutes malice on the part of the Counterclaim Defendants. At no point did the Counterclaim Defendants have any privilege in their publication.

70.    As a direct and proximate result of the foregoing conduct, the Counterclaim Plaintiff DWW was severely injured and suffered pecuniary loss from the publication in the following ways:

    a)    Gross domestic sales dropped off from approximately $17,000 per month for February 2003 – August 2003, on average, to $9,000 per month for September 2003 – April 2005;

    b)    The Counterclaim Plaintiff's reputation in the industry has been impugned and maligned and its goodwill irretrievably damaged;

c)    Commercial purchasers of the Product continue to reject sales overtures, having been influenced to do so by the Marketing Materials;

d)    The Counterclaim Plaintiff lost orders that it reasonably expected to receive, based on its past business with the contracting parties, or based on discussions that had progressed toward a sale;

e)    It lost commitments for increased orders of the Product, which orders would have increased domestic sales substantially; indeed, DWW was poised for expansive growth in 2003;

f)    The value and vendibility of the DWW Product has been drastically and irretrievably impaired;

g)    DWW has incurred expenses in attempting to counteract the publication, including this litigation;

j)    DWW dealers abandoned the Product, and DWW was unable to replace them because of the impact of the Marketing Materials; and

k)    DWW's contract negotiations with a prospective joint venture partner were delayed, and the terms of the agreement under negotiation were rendered less favorable to DWW.

71.    As a direct and proximate result of the Counterclaim Defendants' conduct, the Counterclaim Plaintiff has been injured and has suffered money damages.

**THIRD COUNT** (Tortious Interference with Contractual Relations)
(by DWW, against all Counterclaim Defendants)

1-71.  Paragraphs 1 through 71 of the Complaint are hereby repeated and realleged as if fully set forth herein.

72.    Counterclaim Plaintiff DWW enjoyed contractual relationships with a number of customers who had already purchased or had contracted to purchase the product as of the time of the publication of the Marketing Materials.  In addition, DWW enjoyed contractual relations with its independent dealers, water treatment companies.

73.    Counterclaim Defendants had knowledge of these relationships.

74.    By publishing the Marketing Materials, Counterclaim Defendants intended to interfere with those contractual relationships by deterring existing customers from purchasing additional DWW Products.

75.    Counterclaim Defendants' interference was accomplished by improper means, namely, by publishing the Marketing Materials, which constituted an injurious falsehood.

76.    As a consequence of Counterclaim Defendants' conduct, DWW suffered actual loss, including but not limited to:

   a)    Gross sales dropped off from approximately $17,000 per month to approximately $9,000 per month.

   b)    Regular customers cut back on their business with the Counterclaim Plaintiff, in some instances citing the Marketing Materials and/or the information contained therein as the reason for doing so; and

   c)    Dealers and their sales people abandoned the Product, and DWW was unable to replace them because of the impact of the marketing materials.

14

77.    As a direct and proximate result of the Counterclaim Defendant's conduct, the Counterclaim Plaintiff has been injured and has suffered money damages.

**FOURTH COUNT (Tortious Interference with Prospective Advantage)**
**(by DWW, against all Counterclaim Defendants)**

1-77.    Paragraphs 1-77 of the Complaint are hereby repeated and realleged as if fully set forth herein.

78.    Counterclaim Plaintiff DWW, at or about the time of the publication of the Marketing Materials, was poised for rapid growth.  Its expanded network of dealers had many prospective customers at various stages of pre-contract negotiations.

79.  After publication of the Marketing Materials, it became difficult for Counterclaim Plaintiff DWW to market the DWW product.  Prospective customers canceled meetings.   Other prospects refused to meet with DWW.  Still others broke off discussions.  When they gave a reason, prospective customers specifically cited the Marketing Materials.

80.    By publishing the Marketing Materials, Counterclaim Defendants intended to interfere with DWW's business expectancies and prospective advantage by deterring potential customers from purchasing DWW Products.

81.    Counterclaim Defendants' interference was accomplished by an improper means, namely, by publishing the Marketing Materials, which constituted an injurious falsehood.

82.     As a consequence of Counterclaim Defendants' conduct, DWW suffered actual loss, including but not limited to:

a)      DWW lost contracts that it reasonably expected to enter into, based on its past business with the contracting parties;

b)      DWW lost commitments for new or increased orders of the Product, which orders would have increased domestic sales substantially;

c)      DWW lost opportunities to sell the Product to other potential customers, who had previously formed a ready market for Counterclaim Plaintiff's unique product, because the marketplace had been poisoned by the Counterclaim Defendants' injurious falsehood;

d)      DWW's gross sales, which were increasing on a consistent basis at the time the Marketing Materials began to circulate, precipitously declined; and

f)      DWW was unable to attract new dealers for the Product.

83.     As a direct and proximate result of Counterclaim Defendant's conduct, Counterclaim Plaintiff has suffered money damages.

**FIFTH COUNT**  **(Unfair Competition)**
                **(By DWW against all Counterclaim Defendants)**

1-83.   Paragraphs 1-83 of the Fourth Count are hereby repeated and realleged as if fully set forth herein.

84.     The conduct of Counterclaim Defendants constitutes unfair competition.

85.     Counterclaim Plaintiff DWW has suffered damages.

**SIXTH COUNT**  **(Unfair Trade Practices)**
                **(by DWW against Halox)**

16

1-85.    Paragraphs 1-85 of the Fifth Count, are hereby repeated and realleged as if fully set forth herein.

86.    Counterclaim Plaintiff DWW and Counterclaim Defendants are engaged in trade or commerce within the meaning of Conn. Gen. Stat. §42-110b(a).

87.    Counterclaim Defendants' actions constitute unfair or deceptive acts or practices within the meaning of Conn. Gen. Stat. §42-110b(a).

88.    As a result of Counterclaim Defendant's actions, Counterclaim Plaintiff DWW has suffered ascertainable losses of money or property.

89.    The Counterclaim Defendants' conduct was immoral, unethical, unscrupulous, oppressive, all in violation of Connecticut General Statute Sec. 42-110a et seq., the Connecticut Unfair Trade Practices Act ("CUTPA").

90.    Counterclaim Defendants' conduct was willful and/or reckless.

**SEVENTH COUNT (Defamation)(by Allison Sampson, against all Counterclaim Defendants)**

1-90.    Paragraphs 1-90 of the Sixth Count, are hereby repeated and realleged as if fully set forth herein.

91.    The defamatory action complained of in this petition is libelous and/or slanderous within the meaning of Section 73.001 of the Civil Practice and Remedies Code in that it

17

impeaches Counterclaim Plaintiff's honesty, integrity, virtue and reputation. Moreover, since Counterclaim Defendants charge that the Counterclaim Plaintiff is dishonest and assert that she is a thief and liar, this action is libelous or slanderous per se. These false allegations were made negligently and/or intentionally.

92.    As a direct and proximate result of the occurrence made the basis of this lawsuit, Counterclaim Plaintiff, Allison Sampson, was caused to suffer shame, embarrassment, humiliation and mental pain and anguish and has thereby been caused to suffer bodily injury. Additionally, Counterclaim Plaintiff is, and will in the future be seriously injured in her good name and reputation in the community and exposed to the contempt and ridicule of the general public. Counterclaim Plaintiff further alleges a loss of earnings and an impaired earning capacity.

**EIGHTH COUNT (Defamation)(By Richard Sampson, against all Counterclaim Defendants)**

93.    Paragraphs 1-92 of the Sixth Count, are hereby repeated and realleged as if fully set forth herein.

94.    The defamatory action complained of in this petition is libelous and/or slanderous within the meaning of Section 73.001 of the Texas Civil Practice and Remedies Code in that it impeaches Counterclaim Plaintiff's honesty, integrity, virtue and reputation. Moreover, since Counterclaim Defendants charge that the Counterclaim Plaintiff is dishonest and assert that he is a thief and liar, this action is libelous or slanderous per se. These false allegations were made negligently and/or intentionally.

95.    As a direct and proximate result of the occurrence made the basis of this lawsuit, Counterclaim Plaintiff, Richard Sampson, was caused to suffer shame, embarrassment,

humiliation and mental pain and anguish and has thereby been caused to suffer bodily injury. Additionally, Counterclaim Plaintiff is, and will in the future be seriously injured, in his good name and reputation in the community and exposed to the contempt and ridicule of the general public. Counterclaim Plaintiff further alleges a loss of earnings and an impaired earning capacity.

WHEREFORE, Counterclaim Plaintiff DWW claims:

1.     A permanent injunction ordering Counterclaim Defendants to:

(a) cease and desist from distributing, disseminating, or otherwise publishing the unlawfully disparaging statements in the Marketing Materials; and

(b) issue corrective advertising, in the form of a letter on company letterhead and endorsed by representatives of each Counterclaim Defendant, (1) acknowledging the falsity of the statements made in the marketing materials, and (2) and renouncing, revoking, and withdrawing those materials.

2.     Compensatory Damages.

3.     Treble damages, under 15 U.S.C. §1117.

4.     Punitive damages, under Conn. Gen. Stat. §42-110g(a), against Counterclaim Defendant Halox.

5.     Attorneys' fees, under Conn. Gen. Stat. §42-110g(d) (against Counterclaim Defendant Halox) and/or 15 U.S.C. §1117 (against all Counterclaim Defendants).

6.     Interest.

7.     Costs of the action.

And Counterclaim Plaintiffs Richard Sampson and Allison Sampson demand:

1.     Compensatory damages.

2.     Interest.

3.     Costs of the action.

19

**JURY TRIAL DEMANDED**

Edward R. Scofield (ct00455)

Zeldes, Needle & Cooper, P.C.
1000 Lafayette Blvd., Suite 500
Bridgeport, CT 06604
Tel: (203) 333-9441
Fax: (203) 333-1489
e-mail: escofield@znclaw.com

Attorney for Defendants/Counterclaim Plaintiffs

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent via U.S. First Class Mail, postage prepaid, on this date, to:

Michael J. Rye, Esq.
Charles F. O'Brien, Esq.
Cantor & Colburn LLP
55 Griffin Road South
Bloomfield, CT 06002

Dated at Bridgeport, Connecticut on this ___6___ day of June, 2005.

Edward R. Scofield

# EXHIBIT E

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of the 26th day of May, 2006, by and between Halox Technologies, Inc., IDEX Corporation, and Pulsafeeder, Inc. (collectively, the "Halox Parties"), on the one side, and Dripping Wet Water, Inc., Richard L. Sampson, and Allison H. Sampson (collectively, the "DWW Parties"), on the other side. The Halox Parties and DWW Parties are collectively referred to as the Parties to this Agreement.

## RECITALS

1.    The Halox Parties and DWW Parties are parties to an action entitled *Halox Technologies, Inv. v. Dripping Wet Water, Inc., Richard L. Sampson, and Allison H. Sampson,* presently pending in the United States District Court for the District of Connecticut as Case No. 3:03CV1008 (the "Litigation".)

2.    In the Litigation, Halox Technologies, Inc. filed a Second Amended Complaint against the DWW Parties. The DWW Parties filed a Counterclaim against the Halox Parties.

3.    Without any admissions of any kind, and solely to avoid the expense, burdens, and hazards of the pending Litigation, the Parties to this Agreement desire to terminate the Litigation but preserve certain rights each may have. This settlement is intended to terminate the pending Litigation but not constitute a full and complete settlement of any all disputes that may exist between the parties.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    Recitals. The recitals set forth above are incorporated into and made a part of this Agreement as if fully set forth herein.

2.    Effectiveness. This Agreement shall become effective upon delivery of fully executed counterpart copies of this Agreement to each of the Parties.

*Halox adus. DWW | Settlement Agreement*    *executed copy*

3.    Dismissal of Litigation.  The Parties stipulate and agree that the Litigation, Halox Technologies, Inc.'s Second Amended Complaint, and the DWW Parties' Counterclaim, shall each be dismissed with prejudice. The Parties agree to execute a stipulation to dismiss, substantially in the form of Exhibit A hereto, and shall cooperate with each other in the filing of the stipulation and the dismissal of the Litigation with prejudice.

4.    Declaration of Ownership.  The Halox Parties acknowledge and agree that DWW is the owner of patent application 09/919,918.

5.    Reservation of Rights.  Except as stated in paragraph 4 above, each Party to this Agreement each fully reserves any and all rights such Party or its assignees and licensees may have as to claims and defenses related to patent interference proceedings and any alleged patent infringement.

6.    Consent to Representation.  The Halox Parties consent to the representation of the DWW Parties by Harvey Jacobson.

7.    No Admissions.  Nothing contained in this Agreement shall be considered an admission of liability on the part of either Party.

8.    Binding Agreement.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective parents, subsidiaries, affiliates, officers, directors, shareholders, employees, agents, successors and assigns.

9.    Amendment.  No amendment, interpretation, waiver, or termination of any of the provisions of this Agreement shall be effective unless made in writing and signed by each of the Parties to this Agreement.

10.    Attorneys' Fees.  Each Party shall bear its own attorneys' fees, costs and expenses incurred in the preparation and execution of this Agreement and in connection with the Litigation.

11.   Non-Reliance.  Each Party represents and warrants to the other that it is not relying on any statement or representation of the other Party not expressly stated in this Agreement.

12.   Integration.  This Agreement constitutes the entire understanding between the Parties and supersedes any prior understandings, promises, or agreements, written or oral, that in any way relate to the subject matter hereof.

13.   Counterparts.  This Agreement may be executed in counterparts.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

**IDEX CORPORATION, INC.**                    **DRIPPING WET WATER, INC.**

By: _____                By: _____

Title: _Vice President – General Counsel_     Title: _____

Date: _May 21, 2006_                          Date: _____

**HALOX TECHNOLOGIES, INC.**                  **RICHARD L. SAMPSON**
**PULSAFEEDER, INC.**

By: _____                _____

Title: _PRESIDENT  PULSAFEEDER_ Date: _____  Date: _____

Date: _5/26/06_

                                              **ALLISON H. SAMPSON**

                                              _____

                                              Date: _____

W0026557v3

-3-

11.    Non-Reliance. Each Party represents and warrants to the other that it is not relying on any statement or representation of the other Party not expressly stated in this Agreement.

12.    Integration. This Agreement constitutes the entire understanding between the Parties and supersedes any prior understandings, promises, or agreements, written or oral, that in any way relate to the subject matter hereof.

13.    Counterparts. This Agreement may be executed in counterparts.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

**IDEX CORPORATION, INC.**

By: _____

Title: _____

Date: _____

**DRIPPING WET WATER, INC.**

By: _Richard A Sampson_

Title: _Vice President_

Date: _June 8, 2006_

**HALOX TECHNOLOGIES, INC.
PULSAFEEDER, INC.**

By: _____

Title: _____

Date: _____

**RICHARD L. SAMPSON**

_Richard A Sampson_

Date: _June 8, 2006_

**ALLISON H. SAMPSON**

_Allison H. Sa_

Date: _6/8/06_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

HALOX TECHNOLOGIES, INC.,

        Plaintiff,
        Counterclaim Defendant
        v.                   |  Civil Action No. 3:03CV01008 (SRU)

DRIPPING WET WATER, INC.,
RICHARD L. SAMPSON and
ALLISON H. SAMPSON,

        Defendants.
        Counterclaim Plaintiffs

PULSAFEEDER, INC. and IDEX CORP.

        Additional Counterclaim
        Defendants

## STIPULATION TO DISMISS WITH PREJUDICE

The parties, by their undersigned counsel, hereby stipulate to the dismissal with prejudice of the Second Amended Complaint and the Counterclaim in this action, each party to bear its own costs and attorneys fees, all matters in controversy having been fully compromised and settled.

For Plaintiff and
Counterclaim Defendants,

Gerald G. Saltarelli, Esq.
Admitted: *Pro Hac Vice*
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street, Suite 1800
Chicago, IL 60602
Phone: 312-444-9660
Fax: 312-444-9287

- and -

Charles F. O'Brien (ct 22074)
Michael J. Rye (ct 18354)
Cantor Colburn LLP
55 Griffin Road South
Bloomfield, Connecticut 06002
Telephone: (860) 286-2929
Facsimile: (860) 286-0115


For Defendants and
Counterclaim Plaintiffs,

Frank Frisenda, Jr.
Admitted *Pro Hac Vice* (0670)
Frisenda, Quinton & Nicholson
11601 Wilshire Blvd., Suite 500
Los Angeles, California 90025
Telephone: (702) 792-3910
Facsimile: (702) 792-3604

- and -

Edward R. Scofield, Esq. (CT00455)
Zeldes, Needle & Cooper PC
1000 Lafayette Blvd., Suite 500
Bridgeport, CT 06604
Phone: (203)333-9441
Fax: (203)333-1489

For Plaintiff and
Counterclaim Defendants,

_____

Gerald G. Saltarelli, Esq.
Admitted: *Pro Hac Vice*
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street, Suite 1800
Chicago, IL 60602
Phone: 312-444-9660
Fax: 312-444-9287

- and -

Charles F. O'Brien (ct 22074)
Michael J. Rye (ct 18354)
Cantor Colburn LLP
55 Griffin Road South
Bloomfield, Connecticut 06002
Telephone: (860) 286-2929
Facsimile: (860) 286-0115

For Defendants and
Counterclaim Plaintiffs,

_____

Frank Frisenda Jr.
Admitted *Pro Hac Vice* (0670)
Frisenda, Quinton & Nicholson
11601 Wilshire Blvd., Suite 500
Los Angeles, California 90025
Telephone: (702) 792-3910
Facsimile: (702) 792-3604

- and -

Edward R. Scofield, Esq. (CT00455)
Zeldes, Needle & Cooper PC
1000 Lafayette Blvd., Suite 500
Bridgeport, CT 06604
Phone:  (203)333-9441
Fax: (203)333-1489

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

HALOX TECHNOLOGIES, INC.,

        Plaintiff,
        Counterclaim Defendant
        v.

DRIPPING WET WATER, INC.,
RICHARD L. SAMPSON and
ALLISON H. SAMPSON,

        Defendants.
        Counterclaim Plaintiffs

PULSAFEEDER, INC. and IDEX CORP.

        Additional Counterclaim
        Defendants

Civil Action No. 3:03CV01008 (SRU)

## [PROPOSED] ORDER OF DISMISSAL

IT IS HEREBY ORDERED, that plaintiff's second amended complaint and

defendants' counterclaims are hereby dismissed with prejudice, each party to bear its own

costs and attorneys fees.

SO ORDERED this ___ ___ day of _____ ___, 2006

_____
Honorable Stefan R. Underhill
Judge of the United States District Court
For the District of Connecticut

EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HALOX TECHNOLOGIES, INC., | |
| Plaintiff, Counterclaim Defendant v. | Civil Action No. 3:03CV01008 (SRU) |
| DRIPPING WET WATER, INC., RICHARD L. SAMPSON and ALLISON H. SAMPSON, | |
| Defendants. Counterclaim Plaintiffs | |
| PULSAFEEDER, INC. and IDEX CORP. | |
| Additional Counterclaim Defendants | |

## STIPULATION TO DISMISS WITH PREJUDICE

The parties, by their undersigned counsel, hereby stipulate to the dismissal with prejudice of the Second Amended Complaint and the Counterclaim in this action, each party to bear its own costs and attorneys fees, all matters in controversy having been fully compromised and settled.

For Plaintiff and
Counterclaim Defendants,

_Gerald G. Saltarelli, Esq._
Admitted: _Pro Hac Vice_
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street, Suite 1800
Chicago, IL 60602
Phone: 312-444-9660
Fax: 312-444-9287


 - and -


Charles F. O'Brien (ct 22074)
Michael J. Rye (ct 18354)
Cantor Colburn LLP
55 Griffin Road South
Bloomfield, Connecticut 06002
Telephone: (860) 286-2929
Facsimile: (860) 286-0115

For Defendants and
Counterclaim Plaintiffs,

Frank Frisenda, Jr.
Admitted _Pro Hac Vice_ (0670)
Frisenda, Quinton & Nicholson
11601 Wilshire Blvd., Suite 500
Los Angeles, California 90025
Telephone: (702) 792-3910
Facsimile: (702) 792-3604


 - and -


Edward R. Scofield, Esq. (CT00455)
Zeldes, Needle & Cooper PC
1000 Lafayette Blvd., Suite 500
Bridgeport, CT 06604
Phone:  (203)333-9441
Fax: (203)333-1489

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the Stipulation to Dismiss with Prejudice

was served via first class mail, postage prepaid, on this 15th day of June, 2006 upon:

Edward R. Scofield, Esq.
Zeldes, Needle & Cooper, P.C.
1000 Lafayette Blvd., Suite 500
Bridgeport, Connecticut 06604


Frank Frisenda, Jr.
Frisenda, Quinton & Nicholson
11601 Wilshire Blvd., Suite 500
Los Angeles, California 90025


Gerald G. Saltarelli, Es.
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street, Suite 1800
Chicago, IL 60602

By: _____
Charles F. O'Brien

# EXHIBIT G

**Exemplary Comparison of Connecticut Litigation with Present Litigation**

| '05 Counterclaims<br>3:03-cv-1008-SRU (D. Conn.)<br>(quoted from Ex. D) | '08 Counterclaims<br>1:08-cv-1114 (N.D. Ill.)<br>(quoted from Ex. A) |
|---|---|
| 18. The business of DWW would be to manufacture and sell the Sampsons' new invention, which was the subject of a patent application filed in August, 2001. This invention represented an innovate approach to chlorine dioxide generation for water disinfection.<br><br>¶ 18 | 33. Counterclaimanst [sic] are the owners of a unique technology for generating Chlorine Dioxide through Ion Exchange in contrast to conventional Electro-Chemical Technology. As set forth in disclosure of Sampson Counterclaimants' '918 application, in contrast to conventional electro-chemical methods, Counterclaimants' unique technology provides chlorous acid generated from a chlorite salt precursor….<br><br>¶ 33 |
| 20. On or about October 9-13, 2001, the Sampsons and DWW attended the Association of Water Technologies ("AWT") Tradeshow in Dallas, TX. This event was essentially the public launch of the Sampsons' new business, DWW.<br><br>21. At the AWT show, DWW had a display booth. Separately, representatives of both HTC and Idex/Pulsafeeder visited their booth and collected the literature, which clearly explained the technology.<br><br>¶¶ 20–21 | 35. On October 9 through 13, 2001 Counterclaimants first publicly exhibited their generator products at a trade show in Dallas, Texas sponsored by the Association of Water Technologies (AWT). To help explain this unique technology to the consuming public, Counterclaimants distributed marketing literature to the attendees describing the advantages of Counterclaimants' ion exchange technology in contrast to conventional electrochemical generation used by competitors.<br><br>36. On information and belief, Counterdefendants attended the 2001 AWT Expo and received Counterclaimants' literature which disclosed Plaintiffs' [sic] unique technology.<br><br>¶¶ 35–36 |
| 10. In 1994, the Sampsons founded a company known as Halox Technologies Corporation ("HTC").<br><br>11. The business of HTC was to manufacture and sell water disinfection equipment. | 37. On March 22, 2002, Counterdefendant Idex entered into an Asset Purchase Agreement with third party sellers ("the third party Sellers") to acquire certain assets utilizing conventional electro-chemical chlorine dioxide technology.<br><br>38. For this transaction, Counterdefendant |

| '05 Counterclaims<br>3:03-cv-1008-SRU (D. Conn.)<br>(quoted from Ex. D) | '08 Counterclaims<br>1:08-cv-1114 (N.D. Ill.)<br>(quoted from Ex. A) |
|---|---|
|     *    *    *<br><br>15.  In or about March, 2002, assets of HTC were acquired by Counterclaim Defendant Idex Corporation, but the Corporation and business of HTC remained.<br><br>¶¶ 10–15 | Idex formed HT Acquisition Corporation, a wholly-owned subsidiary, to acquire the certain business assets (Electro-Chemical Technology Halox) under the Asset Purchase Agreement.  After the transaction, HT Acquisition Corporation changed its name to Halox Technologies, Inc., (Counterdefendant named herein)….<br><br>¶¶ 37–38 |
| 23.  On or about September 18-21, 2002, at the AWT show in Orlando, Florida, DWW once again had a display booth.<br><br>¶ 23 | 43.  On September 18 through 21, 2002, Counterclaimants again exhibited their unique ion exchange generator technology at the AWT trade show in Orlando, Florida….<br><br>¶ 43 |
| 24.  Paul Beldham and Steve Ebersohl, who were employed by, and were acting on behalf of, Pulsafeeder and/or Idex, visited the DWW booth.<br><br>25.  During their visit to the booth, Beldham approached Richard Sampson and inquired whether DWW would consider exploring a business arrangement with Idex and/or Pulsafeeder, in the form of a joint venture or licensing agreement.  He asked the Sampsons to explain the product more fully to them and to Marta Broge, an Idex employee who had been responsible for the acquisition, by Idex, of Halox.  The Sampsons agreed and made a presentation.<br><br>¶¶ 24–25 | 43.  …Counterdefendants Idex, Pulsafeeder and Halox, were also in attendance.  Specifically, during the AWT trade show Counterdefendants' representative Paul Beldham requested Counterclaimant Richard Sampson to provide a more detailed disclosure of Counterclaimants' unique technology and to demonstrate DWW's generator products to Defendants [sic].  Mr. Beldham stated to Mr. Sampson that he would like to find a way for Counterdefendants and Counterclaimants to "work together" and that Idex had a potential acquisition interest in Counterclaimants' technology.  Based upon Mr. Beldham's representations, the Sampson Counterclaimants provided Counterdefendants representatives, Marta Broge, Steve Ebersohl and Mr. Beldham with more detailed disclosure of Counterclaimants' technology and proprietary business information during the course of several hours.  Such disclosure included significant advantages of Counterclaimants' generator products to the consuming public in the relevant market.  At no time did Counterdefendants, or their respective representative, reveal to |

| '05 Counterclaims 3:03-cv-1008-SRU (D. Conn.) (quoted from Ex. D) | '08 Counterclaims 1:08-cv-1114 (N.D. Ill.) (quoted from Ex. A) |
|---|---|
| | Counterclaimants their covert agreement and plan to copy Counterclaimants' technology, and for Counterdefendants to claim exclusive patent rights through fraudulent inventorship.<br><br>¶ 43 |
| 46.  DiMascio, who had worked under Allison Sampson in the HTC lab, harbored a belief— unbeknownst to Counterclaim Plaintiffs—that the Sampsons' new invention somehow relied on his own work.  Indeed, in September 2002, after the AWT Show, DiMascio, with the consent and approval of Halox, filed a patent application by which he claimed the Sampsons' invention as his own.  Accordingly, DiMascio, who made this view known to Halox, Pulsafeeder, and Idex, was biased against the Sampsons.  Therefore, his investigation was ill-suited to provide a reasonable and objective basis for an evaluation of the DWW Product's performance.<br><br>¶ 46 | 44.  Unbeknownst to Counterclaimants, within days of receiving Counterclaimants' AWT trade show disclosure, on September 30, 2002, Counterdefendants representative, DiMascio filed a patent application in the U.S. Patent and Trademark Office Serial No. 10/065,259 (the '259 DiMascio application) claiming exclusive rights and claiming sole inventorship in Counterclaimants' technology.  The '259 DiMascio application copied significant portions of Counterclaimants' technology disclosed to Counterdefendants and was filed without informing Counterclaimants. Counterdefendants have subsequently filed, or caused to be filed, other U.S. and foreign patent applications which claim priority and or correspond to the '259 DiMascio application. These patents and applications are collectively referred to as "the DiMascio Patents" and are set forth in Exhibit "1" hereto.<br><br>¶ 44 |
| 26.  After the AWT show, Beldham followed up with Richard Sampson.  Beldham reiterated the Idex group's interest in doing business, whether in the form of a licensing agreement, a joint venture, or an outright acquisition.  Beldham arranged for Felix DiMascio, a Halox employee, to visit the Sampsons and DWW.<br><br>27.  Beldham represented that the purpose of DiMascio's visit was to perform due diligence as a prelude to a possible business arrangement. | 45.  Shortly after the Orlando AWT trade show, Paul Beldham, telephoned Counterclaimant Richard Sampson to express Counterdefendants' interest in utilizing Counterclaimants' technology for cooling tower applications.  Specifically, Mr. Beldham stated that Counterdefendant IDEX believed DWW's products to be synergistic with Counterdefendants' Halox generator products rather than competitive.  Mr. Beldham further indicated IDEX was interested in purchasing DWW's products for resale; obtaining a license from Counterclaimants to permit Counterdefendants to manufacture |

| '05 Counterclaims<br>3:03-cv-1008-SRU (D. Conn.)<br>(quoted from Ex. D) | '08 Counterclaims<br>1:08-cv-1114 (N.D. Ill.)<br>(quoted from Ex. A) |
|---|---|
| 28. As such, DiMascio, and Halox, were to act, and did act, as agents of Idex and Pulsafeeder.<br><br>¶¶ 26–28 | Counterclaimants' ion exchange generator products; or for Counterdefendants to acquire Counterclaimants' technology. Mr. Beldham stated his belief that "it would be a good fit" with Counterdefendants' Halox product and would allow Counterdefendants to enter into new segments of the market. Mr. Beldham stated "the cooling tower" market as one commercial application that Counterdefendants would like to exploit with Plaintiffs' [sic] technology. At no time during the course of Mr. Beldham's telephone discussion did he reveal to Counterclaimants Counterdefendants' covert agreement and plan to copy Counterclaimants' technology and for Counterdefendants to wrongfully claim such exclusive patent rights.<br><br>46. In late November 2002, Paul Beldham again telephoned Counterclaimant Richard Sampson to further express Counterdefendants interest in Counterclaimants' technology. During the course of Mr. Beldham's second telephone conversation with Richard Sampson, he requested permission to have Counterdefendant DiMascio visit Counterclaimants' facilities in San Antonio, Texas. The stated purpose for Counterdefendant DiMascio's visit to Counterclaimants' facilities was to further conduct due diligence before Counterdefendants could reach a license agreement, bundling agreement or outright acquisition of Counterclaimants' technology. At no time did Mr. Beldham reveal Counterdefendants' covert agreement and plan to Counterclaimants, nor did Mr. Beldham reveal that Counterdefendants filed, or caused to be filed, the '259 DiMascio application.<br><br>¶¶ 45–46 |
| 30. DiMascio did in fact visit the Sampsons | 47. On December 18 and 19, 2002 pursuant to Counterdefendants' covert agreement and plan, |

4

| '05 Counterclaims<br>3:03-cv-1008-SRU (D. Conn.)<br>(quoted from Ex. D) | '08 Counterclaims<br>1:08-cv-1114 (N.D. Ill.)<br>(quoted from Ex. A) |
|---|---|
| in Texas for two days in December, 2002.<br><br>31.  During his visit, DiMascio had numerous discussions with both Richard and Allison Sampson.<br><br>32.  The Sampsons and DWW gave DiMascio their full cooperation, based on Beldham's representations to them that the purpose of the visit was to perform due diligence on the DWW technology to enable Idex to evaluate the prospect of doing business with the Sampsons and DWW.<br><br>33.  The Sampsons and DWW allowed DiMascio unfettered access to their manufacturing facility, demonstrated the operation of a unit, and answered his questions about the technology in detail. DiMascio represented that he was impressed with the product and that he intended to recommend that the two companies do business together.<br><br>¶¶  30–33 | DiMascio met with Counterclaimants in San Antonio, Texas to obtain further disclosure and proprietary information from the Sampson Counterclaimants relating to Counterclaimants' unique generator product line and technology.  Counterdefendant DiMascio stated to the Sampson Counterclaimants that his visit and requested disclosure was for Counterdefendants' due diligence in forming a cooperative business arrangement with Counterclaimants to commercially exploit Counterclaimants' unique technology.  Based upon Counterdefendants' continuing representations, and that of DiMascio, the Sampson Counterclaimants provided Counterdefendants with further detailed disclosure of their unique technology, system costs, system components, system characteristics, pricing structure and marketing strategy.  At no time did DiMascio reveal Counterdefendants' covert agreement and plan, nor the filing of the '259 DiMascio application.<br><br>¶  47 |

# EXHIBIT H

# *Delaware*

PAGE 1

### *The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"HALOX TECHNOLOGIES, INC.", A DELAWARE CORPORATION,

WITH AND INTO "EASTERN PLASTICS, INCORPORATED" UNDER THE NAME OF "EASTERN PLASTICS, INCORPORATED", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF CONNECTICUT, AS RECEIVED AND FILED IN THIS OFFICE THE TWENTY-EIGHTH DAY OF JULY, A.D. 2006, AT 1:50 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.



Harriet Smith Windsor, Secretary of State

4196951   8100M

060712923

AUTHENTICATION: 4937366

DATE: 07-28-06

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:02 PM 07/28/2006*
*FILED 01:50 PM 07/28/2006*
*SRV 060712923 - 3511419 FILE*

# CERTIFICATE OF MERGER
## OF
## HALOX TECHNOLOGIES, INC.
### (a Delaware corporation)

## INTO

## EASTERN PLASTICS, INCORPORATED
### (a Connecticut corporation)

---

Under Section 252 of the
General Corporation Law of the State of Delaware

Halox Technologies, Inc., a Delaware corporation with an office at 304 Bishop Avenue, Bridgeport, Connecticut 06610, and Eastern Plastics, Incorporated, a Connecticut corporation with an office at 110 Halcyon Drive, Bristol, Connecticut 06010, do hereby certify that:

FIRST:        Eastern Plastics, Incorporated, incorporated pursuant to the Business Corporation Act of the State of Connecticut, and Halox Technologies, Inc., incorporated pursuant to the General Corporation Law of the State of Delaware, are the constituent corporations (individually a "Constituent Corporation").

SECOND:      An Agreement and Plan of Merger has been approved, adopted, certified, executed and acknowledged by each of the constituent corporations in accordance with Section 252(c) of the General Corporation Law of the State of Delaware.

THIRD:        The name of the surviving corporation is Eastern Plastics, Incorporated, a Connecticut corporation (the "Surviving Corporation").

FOURTH:      The certificate of incorporation of the Surviving Corporation shall be its certificate of incorporation.

FIFTH:        The executed Agreement and Plan of Merger is on file at the principal place of business of the Surviving Corporation at 110 Halcyon Drive, Bristol, Connecticut 06010.

- 2 -

SIXTH:    A copy of the Agreement and Plan of Merger will be furnished by the Surviving Corporation, on request and without cost, to any stockholder or shareholder of any Constituent Corporation.

SEVENTH:    The Surviving Corporation agrees that it may be served with process in Delaware in any proceeding for enforcement of any obligation of any constituent corporation of Delaware as well as for enforcement of any obligation of the Surviving Corporation arising from the merger including any suit or other proceeding to enforce the right of any stockholder as determined in appraisal proceedings pursuant to §262 of the Delaware General Corporation Law, and shall irrevocably appoint the Secretary of State as its agent to accept service of process in any such suit or other proceeding.  The Secretary of State shall mail a copy of any process to 110 Halcyon Drive, Bristol, Connecticut 06010.

EIGHTH:    The effective date of the merger of Halox Technologies, Inc. into Eastern Plastics, Incorporated shall be July 28, 2006.

IN WITNESS WHEREOF, the undersigned declare this Certificate to be the act and deed of the Constituent Corporations, and that the facts stated therein are true under penalties of perjury, this 28th day of July, 2006.

**[SIGNATURES ON FOLLOWING PAGE]**

- 3 -

Date: As of July 28, 2006

HALOX TECHNOLOGIES, INC.

By: _____
Frank J. Notaro, Vice President

EASTERN PLASTICS, INCORPORATED

By: _____
Frank J. Notaro, Vice President

000160/09953 BFLODOCS 1601438v1